# THE MAYOR AND COUNCIL OF HAGERSTOWN

## VS.

# THE HAGERSTOWN RAILWAY COMPANY OF WASHINGTON COUNTY, MARYLAND.

*Municipal corporations: when estopped from denying franchises.*

A municipal corporation may set up a plea of *ultra vires*, or its own want of power under its charter to enter into a given contract, or to do a given act, in exercise of its corporate power and authority, and the fact that the other party to the contract had expended money on the faith of such agreement does not estop the municipal corporation from so doing.          , p. 192

But if a municipal corporation has the power to grant a right or franchise, and the corporation believing and assuming that it has the consent or grant of the municipality, has with the knowledge of the proper municipal authorities, proceeded to exercise the right or franchise, and has constructed, maintained and operated its work and applicances in the City streets, the municipality may, in a proper case, be estopped, by the conduct of its officers and representatives in knowingly permitting and acquiescing in the use and occupation of the streets, from asserting the invalidity of the grant of the franchise.          p. 193

*Decided March 31st, 1914.*

Appeal from the Circuit Court for Washington County. In Equity.  (HENDERSON, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Alexander R. Hagner* and *S. S. Field,* for the appellant.

*Francis K. Carey* and *James Piper,* for the appellees.

THOMAS, J., delivered the opinion of the Court.

The appeal in this case is from a decree of the Circuit Court for Washington County dismissing the bill of complaint of the Mayor and Council of Hagerstown to enjoin the Hagerstown Railway Company of Washington County, Maryland, from erecting or replacing poles in the streets, etc., of Hagerstown, and stringing wires thereon for the purpose of supplying light and power to the citizens of that city, and from furnishing electric light and power therein.

The case was heard upon bill, answer and evidence, and while there is very little, if any, dispute as to the material facts, a statement of them is necessary for a clear and accurate presentation of the propositions involved.

The Charter of Hagerstown, sections 171 and 182 of Art. 22 of the Code of Public Local Laws of 1888, provided that the Mayor and Council should have power to pass all ordinances necessary for the good government of the town; to prevent, remove and abate all nuisances or obstructions in or upon the streets, alleys, etc.; "to make and establish grades upon the streets and highways of the town;" to cause the sidewalks along the streets to be graded and paved and "curbs to be set and gutters laid;" to grant licenses to hawkers and peddlers, and regulate the sale of wares and merchandise on the streets; to regulate and tax carriages and other vehicles used in the town, and to provide for laying out, opening, closing, etc., any street, etc., in the town. Section 183 provides for the appointment of street commissioners, who are required to elect one of their number as president; to keep a full and accurate record of all their proceedings, and to report every three months to the Mayor and Council an itemized account of all money expended by them. The clerk of the Mayor and Council is required to serve as "clerk of the Board of Street Commissioners," who have charge of the

repairs and improvements of the streets, alleys, etc., and, by section 191, and the Act of 1892, Ch. 65, are given control of the lighting of the town, with power to provide the material, employ the necessary labor and make all needed provision therefor, and the further power "to contract with any person, corporation or association for such lighting," provided that the cost of lighting under any contract does not exceed $5,000.00 per year, and the contract is not made for a longer period than ten years.

In 1893 the Board of Street Commisioners entered into a contract with the Schuyler Electric Company for the lighting of the streets of the city. On the 10th of May, 1895, the Mayor and Council passed an ordinance authorizing Powell Evans, his heirs and assigns, "for the purpose of supplying electric current for all purposes, to erect and maintain poles on all streets, alleys and city properties within the city limits of Hagerstown, and to string and maintain electrical conductors and other wires, and to place and maintain all necessary apparatus on said poles for said purposes; * * * to make connections with all buildings in the city limits, and erect and maintain in the city limits power plants for providing for the distribution of electric current;" to connect with any system or systems outside of the city limits for supplying electric current, and to sell, lease or rent electric current and apparatus for making use of the same. "Provided that electric current for motive power for machinery be supplied in the City of Hagerstown as a necessary condition of the use of the powers conferred in this ordinance." Section 2 of the ordinance provided that the location of the poles should be approved by a committee consisting of the Mayor and two members of the City Council, to be selected by the Mayor, who were authorized to order the location of the poles to be changed. Section 3 required Evans, his heirs and assigns, to enter into a bond to remove the poles if they were not used "in one year after erection for supplying electric current," etc. By section 4 the Mayor and City Council

reserved the right to string on said poles the wires connected with the fire alarm system of the city, and provided that the franchise granted by said ordinance was to be accepted upon that condition, and section 6 authorized Evans, his heirs and assigns, to purchase, etc., any system for supplying electric current then "constructed in the city limits," and authorizing the corporation owning any such system to sell the same to Evans, his heirs or assigns.

Powell Evans entered into a contract with the Schuyler Electric Company for the purchase of its plant, contracts, etc., and on the 11th day of November, 1895, the Board of Street Commissioners passed an order in which, after referring to the contract made with the Schuyler Company, and reciting that said company had contracted to sell its plant, franchises, contracts, etc., to Evans, it was ordered that the following contract "take the place" of the contract which the board had entered into with the Schulyer Company. The contract referred to in the order was executed on the 11th of November, 1895, by Evans and the Street Commissioners. It provided that Evans should "have the contract for lighting the streets * * * with the Schuyler or any other equally as good system" for the term of five years, beginning on or before January 1st, 1896, as set out in said order, provided Evans, in the meantime, purchased, by deed duly recorded, the "present electric plant complete in this city," and "has given" a bond to the commissioners, in the penalty of $5,000, to secure the faithful performance of his contract. After specifying the kind of lights to be furnished, the amount to be paid by the city for each light, that the lights were to be located and maintained on good wooden poles, etc., satisfactory to the commissioners, at the points on the streets where they were then located, unless otherwise ordered by the commissioners, and that the commissioners should designate the places at which new lights were to be located, the contract further provided that Evans should also furnish and maintain in the city "an incandescent lighting system."

satisfactory to the Street Commissioners, "of not less than 1200 lights, for commercial and private purposes," and furnish light to consumers in the city on terms not to exceed the rates therein stated, and that Evans should have the right to sell "his property and rights in Hagerstown," including his rights under that contract, and to have his bond released, provided his assignee gave a bond in the penalty of $5,000, for the faithful performance of said contract.

The appellee, the Hagerstown Railway Company, was incorporated under the general incorporation law in 1896 for the purpose of constructing and operating a passenger railway in Hagerstown and Washington County.  Its charter was amended by the Act of 1896, Ch. 419, which authorized the company to issue bonds and to acquire by purchase or condemnation land necessary for the construction of its railway.   Section 111 of Art. 23 of the Code of 1888 was amended by the Act of 1894, Ch. 308 (Code of 1904, Art. 23, sec. 143), so as to provide that any electric light company formed under that article should have the power to manufacture, furnish and sell electric light and power in any city or town of Kent, Somerset, Carroll, Montgomery or Washington counties for lighting the streets, roads, public or private building, or for motive power or other purposes, and authority to build its lines along and upon the streets, roads, etc., subject to such ordinances as might be passed by any city or town for filling up or restoring such streets or roads to their normal condition, provided that "in the construction, maintenance, removal and repair of all such lines and appliances in Washington county, the same shall be done under such regulations as the Mayor and City Council of Hagerstown, or the County Commissioners of said county, having jurisdiction, shall prescribe."  On the 28th of February, 1898, the certificate of incorporation of the appellee was amended under the provisions of the general incorporation law, and the new certificate declared that the corporation was formed for the purpose of constructing and operat-

ing a railway, etc., and also "for the purpose of manufacturing, generating, selling and furnishing electricity for lighting, heating, power and other purposes, and to buy, purchase, construct, build, equip and operate such plants, works and machinery as may be necessary for such purposes." The Railway Company then acquired by assignment the electric plant, contracts and franchises of Powell Evans in Hagerstown, and on the 1st day of March, 1898, executed its bond to the Mayor and Council of Hagerstown, in the penalty of $5,000, for the faithful performance by it of the contract between Evans and the Board of Street Commissioners. On the 29th of March, 1898, the Board of Street Commisioners passed the following resolution:

"Whereas, Powell Evans has sold to the Hagerstown Railway Company of Washington County, Maryland, the Electric Light Plant in Hagerstown, and has requested the Board of Street Commissioners to accept the bond of the said Railway Company in the penalty of five thousand dollars in lieu of a bond filed by him, the said Powell Evans. Now, therefore, be it

"*Resolved,* That the Board of Street Commissioners of Hagerstown, Maryland, do hereby accept the bond of the Hagerstown Railway Company of Washington County, Maryland, principal, and the Fidelity and Deposit Company of Baltimore, Maryland, as surety, in the penalty of five thousand dollars in lieu of the bond heretofore accepted by the said Board of Street Commissioners from Powell Evans and now on file in the office of the Mayor and Council of Hagerstown, and that the contractural obligations now existing by and between Powell Evans and the Board of Street Commissioners are hereby accepted by the Board of Street Commissioners, to be performed and carried out by and on the part of the Hagerstown Railway Company of Washington County, Maryland, in lieu of the said Powell Evans and as referred to in the bond filed by the Hagerstown Railway Company of Washington County, Maryland, and being a part thereof."

By the Act of 1898, Ch. 479, approved April the 9th, entitled "An Act to amend the charter and to extend the powers of the Hagerstown Railway Company of Washington County, Maryland, so as to confer upon said company," powers, "in addition to the powers heretofore granted," the charter of the appellee was again amended, and it was provided

> "that said company shall have the right to carry over its railway or any of its connections, for hire, express matter and merchandise, and shall also have power to manufacture, furnish and sell to persons or corporations electric light, electric heat and power, and to contract for and furnish electric light for lighting streets, roads, private or public buildings in said county, and to furnish electricity for motive power and other purposes, to any and all persons and corporations * * * , and by and with the consent of the municipal authorities or town officers, in any city or town in said county, to lay, purchase, construct and build lines, conductors and conduits under, along, upon or over the streets or alleys in any town in said county, * * * and to connect said lines, conductors and conduits with any manufactory or private buildings, lamps or other structures, objects, cars or conveyances in Washington county."

After the assignment by Powell Evans to the Railway Company of his plant, contracts, etc., the Railway Company operated that plant, lighting the streets and furnishing light and power to the citizens of Hagerstown, in accordance with the provisions of the ordinance and contract, until the fall of 1898, when it built a new and very much larger plant for that purpose. After the erection of the new plant the appellee continued to furnish electricity for lighting the streets of the city until the expiration of the contract referred to, and ever since it purchased the Evans plant it has been engaged in furnishing light and power to private consumers in the city and suburbs of Hagerstown. During that time, in addi-

tion to the establishment of the new plant, new poles have been erected, lines have been extended and new contracts have been obtained for furnishing light and power to individuals and corporations. The poles erected or maintained by the Railway Company for supplying light and power, were from time to time changed, replaced and painted in accordance with resolutions passed by and an agreement with the Mayor and Council, and have been used by the city in connection with its fire alarm system.

By the Act of 1898, Ch. 381, the Mayor and Council of Hagerstown were authorized "to issue bonds to raise a sum of money to erect a plant for the purpose of supplying the town with electric light and power, or either, in the discretion of the Mayor and Council," and by the Act of 1900, Ch. 75, provision was made for the establishment by the city, with the approval of a majority of the voters of the city, of an electric light plant of sufficient capacity to light the streets and to supply the citizens with light. The plant was completed in 1902, and since then the Mayor and Council have been furnishing light to private consumers in the city. In 1910 and 1913 the Mayor and Council notified the Railway Company to cease furnishing light and power to the citizens of Hagerstown, and to remove all poles used by it for that purpose from the streets and alleys of the city, and upon the failure of the Railway Company to comply with said notices the Mayor and Council, on the 17th of January, 1913, filed the bill of complaint in this case for an injunction as we have stated.

The contentions of the appellant are (1) that the Mayor and Council had no power to pass the Powell Evans Ordinance, and that the ordinance is void; (2) that the Act of 1894, Ch. 308, did not confer upon the Mayor and Council of Hagerstown any power to grant a franchise for furnishing electric light and power in the city; did not give any right to Powell Evans because he was not an "electric light company," and did not confer any power upon the Railway Company because at the time that Act was passed the Railway

Company was not an "electric light company formed under" that article; (3) that after the Railway Company became, by an amendment of its certificate of incorporation, an electric light company it did not apply to the Mayor and Council for an ordinance prescribing the regulations under which it could exercise the rights granted by the Act of 1894; (4) that after the passage of the Act of 1898, Ch. 479, the Railway Company could no longer exercise the right to furnish electric light and power in the city without the consent of the Mayor and Council, which could only be given by an ordinance regularly passed for that purpose, and (5) that the use of the streets by the Railway Company for the purposes stated is a trespass and a nuisance.

Even if we assume, without so deciding, that the Powell Evans Ordinance is void as a grant of a franchise to use the streets for the purpose of furnishing electric light and power to private consumers; that the appellee, after the amendment of its certificate of incorporation, failed to avail of the powers granted to electric light companies by the Act of 1894, and that after the amendment of its charter by the Act of 1898 the rights and powers thereby granted could only be exercised "with the consent of the municipal authorities or town officers" of Hagerstown, the question remains whether the consent referred to in that Act must, under the circumstances disclosed by the record, be evidenced by an ordinance of the Mayor and Council.

It is not necessary to determine in this case whether an electric light company, with such authority as was granted the appellee by the Act of 1898, must secure from the Mayor and Council of Hagerstown an *ordinance* consenting to the exercise of its powers before attempting to do so, and the only question we need determine is whether under all the circumstances the city is estopped from denying that its consent was obtained by the appellee.

Learned counsel for the appellant insist that the erection and maintenance of the poles of the appellee in the streets of the city amount to a trespass and a nuisance which cannot

ripen into a franchise, and they cite cases to the effect that an encroachment upon a highway cannot grow by prescription into a private right; that franchises must be obtained by legislative grants, and that a municipal corporation cannot be estopped from asserting that it had no power to grant the particular franchise: *Baldwin* v. *Trimble,* 85 Md. 398; *Purnell* v. *McLane,* 98 Md. 594; *Water Co.* v. *Baltimore Co.,* 105 Md. 159; *Mealey* v. *Hagerstown,* 92 Md. 753.

In the case of *Mealey* v. *Hagerstown, supra,* the Court said: "a municipal corporation may set up a plea of *ultra vires* or its own want of power under its charter or constituent statute, to enter into a given contract or to do a given act in excess of its corporate powers and authority," and held that it could not be estopped from doing so because the other party to the contract expended money "on the faith of the agreement." The rule there stated has not been questioned and may be regarded as settled in this State. Here, however, there is no question as to the *power* and *authority* of the Mayor and Council of Hagerstown under the Act of 1898, Ch. 479, *to consent* to the exercise by the Railway Company of the rights therein granted, and the application of the doctrine of equitable estoppel to the facts of this case does not operate to confer upon the Mayor and Council powers not vested in the municipality by its charter or the statute, or to exact *from it* rights and privileges it had no power to grant. The Act of 1898 expressly authorized the Railway Company to erect its poles and furnish light and power in the city with the consent of the "municipal authorities," and the authority of the Mayor and Council to give that consent cannot be, and is not disputed.

The distinction between a case in which the municipality has the power to grant the franchise in question, and a case in which it has no such authority is well recognized. It is said in 4 *McQuillin, Mun. Corp.,* sec. 1687, "that a municipality cannot be estopped to question the use of its streets without a franchise, or the validity of a franchise, where it had *no power* to grant such a franchise, * * * On the other

hand, if a municipality *has the power to grant a franchise,* and a public service company uses the streets with the knowledge of the municipality, the latter may be estopped to question the right to use the streets without a franchise, or the validity of the franchise granted where it does not violate statutory or charter requirements. For instance, a municipality, which has acquiesced for years in the use of its streets by a public service company, which has spent thousands of dollars in connection with such use, and which has received the benefits of such use of the streets and has regulated the use and levied licenses and granted permission as to certain uses, cannot contest the right of the company to use the streets. Likewise, acquiescence by a municipality in the use of the streets by a railway company pursuant to a grant of such right by the legislature, precludes the municipality from objecting thereto." In 3 *Dillon, Mun. Corp.* (5th Ed.), sec. 1242, JUDGE DILLON says: "And if the municipality has the power to grant such right or franchise, and a corporation, believing and assuming that it has the consent or grant of the municipality, has, with the knowledge of the proper municipal authorities, proceeded to exercise the right or franchise, and has constructed, maintained and operated its works and appliances in the city streets, the *municipality will,* in a proper case, *be estopped by the acts and conduct of its officers* and representatives in knowingly permitting and acquiescing in the use and occupation of the streets, from asserting the invalidity of the grant of the franchise, so far, at least, as concerns its own failure to pass an ordinance or take the steps necessary to effectuate the grant."

The same principle has been repeatedly recognized and applied by this Court. *Baldwin* v. *Trimble, supra; Arey* v. *Bear,* 112 Md. 541; *Cushwa* v. *Williamsport,* 117 Md. 306; *Whittington* v. *Com'rs. of Crisfield,* 121 Md. 387. In *Baldwin's Case,* CHIEF JUDGE McSHERRY, after stating that an encroachment upon a highway can never grow by prescription into a private right, said that that rule was in perfect harmony with the doctrine that an equitable estoppel may be

asserted even against the public in favor of individuals where justice requires it, and quoted the statement of JUDGE DILLON (2 *Dillon Mun. Corp.,* 2nd Ed., sec. 433), that "There is no danger in recognizing the principle of an *estoppel in pais* as applicable to such cases, as this leaves the Court to decide the question, not by the mere lapse of time, but by all the circumstances of the case, to hold the public estopped or not, as right and justice may require." In *Arey's Case* JUDGE BURKE said: "The statute has long since become a complete bar to the assertion by anyone against the appellees of rights in the alley, and if it be conceded that it were a public alley, under the circumstances of the case an equitable estoppel would be created against the public to assert a right to the use of the highway." In *Cushwa's Case* CHIEF JUDGE BOYD refers with approval to the statement of the Court in *Baldwin's Case,* and in the *Whittington's Case* the Court adopts JUDGE DILLON's statement of the principle in the 4th Edition of his work, section 675. It is true that in *Baldwin's Case* there was evidence of an abandonment of the highway, but the principle announced is not founded upon an abandonment of a street or highway, and may be applied whenever under all the circumstances justice requires it. Nor does the doctrine conflict with the rule stated in *Purnell* v. *McLane, supra,* and *Water Co.* v. *Baltimore Co., supra,* that the assertion of the existence of a franchise must be supported by a grant from the municipality or legislature. It rests upon the principle that the municipality may, in obedience to the demands of justice, be estopped by its own conduct, or the conduct of its officers, from denying the existence or validity of such a grant.

Numerous cases from other jurisdictions support the rule, and many of them are cited in the briefs of counsel for the appellee, but the principle is so clearly approved in this State that only a few of them are referred to here. In the case of *People* v. *City of Rock Island,* 215 Ill. 488, 74 N. E. 437, the Supreme Court of Illinois said: "It has frequently been decided that the doctrine of estoppel *in pais* is applicable

to municipal corporations, and that they will be estopped, or not, as justice and right may require. There may be cases where, under all the circumstances, to assert a public right would be to encourage and promote a fraud. Where a party acting in good faith under affirmative acts of a city has made such expensive and permanent improvements that it would be highly inequitable and unjust to destroy the rights acquired, the doctrine of equitable estoppel will be applied. The hardships that would result from a contrary holding, and the necessity of raising an estoppel in particular cases to prevent fraud and injustice, have induced the establishment of the rule; and it has been several times said that there is neither danger to the public nor injustice in the application of the doctrine." In the case of *Louisville* v. *Cumberland Tel. Co.,* 224 U. S. 649, the Court, speaking through Mr. JUSTICE LAMAR, said: "The company, in pursuance of the collateral contract contained in the ordinance, and of the requirements of the consolidation statute, carried the police and fire wires of the city free of charge. With the knowledge and acquiescence of the city, and in reliance on the statutory conveyance of the street rights, the Cumberland Company, at an expense of more than a million dollars, erected many new poles, laid additonal conduits and strung miles of wire in extending and improving the telephone system. This action of the council could not enlarge the charter grant, but did operate to estop the city (*Boone County* v. *Burlington & M. R. R.,* 139 U. S. 684, 693) from claiming that the ordinance was inoperative and it also prevented the Council from denying that the Cumberland Company had succeeded to every right and obligation of the Ohio Valley Company." In *City of Bradford* v. *N. Y. & P. Tel. & Tel. Co.,* 56 Atl. Rep. 41, the case is stated in the syllabus as follows: "A city filed a bill to compel a telegraph and telephone company to remove its poles and wires from the streets which it had occupied for more than 21 years without objection, after an expenditure of about $100,000. Many resolutions of the city council had given permission for the erection and use of the poles and cross-

arms on the streets. In consideration of the privileges, the city had obtained a right to the use of the poles for the carrying of the fire-alarm system, and had also levied licenses and pole taxes, and had used telephones furnished by the company down to the date of the hearing, and had regulated by ordinance the manner in which the poles should be erected under the direction of the street committee of council or the city engineer." There the Supreme Court of Pennsylvania, in dismissing the bill, said: "In the present case the acquiescence and the laches of the appellant are clearly in the way of any equitable relief to it."

In the case at bar the Mayor and Council passed the ordinance authorizing Powell Evans and *his assigns* to erect and maintain poles in the streets of the city for the purpose of "supplying electric current for all purposes," and providing that the city should have the right to string the wires of its fire-alarm system on the poles. The Board of Street Commissioners entered into the contract with Evans for the lighting of the streets; requiring him to establish an "incandescent lighting system," and to furnish light to the citizens of Hagerstown at the rates therein mentioned, and authorizing him to assign said contract upon the conditions therein stated. The Railway Company, with the knowledge of the Mayor and Council and the Street Commissioners, became the assignee of the Evans Plant and his contract with the city, executed its bond to the Mayor and Council, as required by the contract, and, in order to provide for the existing and future needs of the City, erected a new and very much larger plant for the purposes stated in said agreement and ordinance. The appellee extended its lines, entered into new contracts for furnishing light and power to private consumers in the City and suburbs, and erected new poles with the knowledge of the Mayor and Council and Street Commissioners. The poles were replaced, changed and painted when and as directed by the Mayor and Council, and the City has used the poles in maintaining its fire-alarm system. After

the appellee has used the streets of the City under the cir cumstances and for the purposes stated, for more than fourteen years, it would be most inequitable to permit the City to assert that it did not give its consent to such use of the streets. To compel the appellee to remove its poles and to abandon the business which it has established at much cost, and which the City encouraged and regulated, would impose a great hardship upon the appellee. Such demands cannot appeal to a Court of Equity, and upon no principle of right and justice can the relief prayed in this case be granted.

While the Act of 1900, Chapter 75, provided that after the erection of the plant therein mentioned there should be "no lighting," at the expense of the City, of the *streets* and *alleys* of the City, "except" by the plant "owned and maintained by the Mayor and Council," there is nothing in that Act or the Act of 1898, Chapter 381, to indicate any intention of the Legislature to give the City the exclusive right to furnish electric light and power to *private consumers* in the City, or to abridge the right of the appellee to do so.

For the reasons stated we must hold that the appellant is estopped from asserting that it did not give the consent referred to in the Act of 1898, Chapter 479, and the decree of the Court below dismissing its bill must, therefore, be affirmed.

*Decree affirmed, with costs to the appellee.*