**MAYOR AND CITY COUNCIL OF BALTIMORE v. CROWN CORK & SEAL CO., Inc., et al. (UNITED STATES, Intervenor).**

No. 4804.

Circuit Court of Appeals, Fourth Circuit.

Aug. 19, 1941.

Wilson K. Barnes and Allen A. Davis, both of Baltimore, Md. (Charles C. G. Evans, of Baltimore, Md., on the brief), for appellant.

L. Vernon Miller and Philip B. Perlman, both of Baltimore, Md. (Jesse Slingluff, Jr., Hershey, Donaldson, Williams & Stanley, Addison E. Mullikin, Frank C. Wachter, and Mullikin, Stockbridge & Waters, all of Baltimore, Md., on the brief), for appellees.

Before SOPER, DOBIE, and NORTH-COTT, Circuit Judges.

SOPER, Circuit Judge.

This suit was brought to settle the boundary lines of the riparian rights of the owners of certain lands fronting on the northeast shore of the Patapsco River for two miles between Colgate Creek and Bear Creek in the harbor of the City of Baltimore. At the northern end of the area the City owns a tract of land upon which it has built an airport, still in course of development, that covers not only fast land inside the original shore line, but also filled land and improvements in the waters of the river. A controversy has arisen between the City and the Mutual Chemical Company, which owns land adjoining the City's property on the south, as to the location of the division line in the waters of the river separating the areas in which they are entitled to exercise their respective riparian rights. The question is whether the line should be fixed by projecting into the river the dividing line between the properties on the land, according to the course thereof as described in the deeds, until it meets the bulkhead and pierhead lines established by the federal government, or whether the dividing line in the waters of the river should run from the end of the dividing line at the shore so as to meet the bulkhead and pierhead lines at right angles. The course of the line first mentioned, which for brevity we shall call the deed line, is south 42°24′ west. The course of the other line is north 66°45′25″ east, and this line will be called herein the Hammond line since it was first fixed by Elmer E. Hammond, Harbor Engineer, and head of the Bureau of Harbors of Baltimore City. These lines, with the bulkhead and pierhead lines as a base, form a right angled triangle that defines the area in dispute.

The Hammond line was fixed in 1928 when the City acquired the land on the water front, in order to establish an airport, and Hammond prepared a plan covering all the land between the two creeks, and showing the divisional lines in the water between the several tracts in the area, including the property of the City. The City now contends that the Hammond line was fixed erroneously and without authority, and that the true southern line of its property is the deed line. If this line is adopted, the City will gain the disputed triangular area to the south, and will secure additional length for the runways of the airport; while the Chemical Company will lose a portion of the area allotted to it under the Hammond plan, and certain improvements in the river which it has made in conformity therewith. The allotment of the triangular area to the city will also invade a portion of the area assigned by the Hammond plan to Sanford and Brooks Company, the owner of the land next adjoining that of the Chemical Company on the south; but the Sanford and Brooks Company has made no improvements

beyond the shore line. A rough sketch of the Hammond plan is appended, on which a broken line indicates the deed line for which the City now contends.

claims. The court further held that the distribution of riparian rights under the Hammond plan was the fairest and most equitable division that could be made, and con-

MAP I

Sketch of
HAMMOND PLAN
as verified

Scale. 1 in = 1000 ft

The suit was brought by the Chemical Company and the Aluminum Ore Company, since replaced by the Crown Cork and Seal Company as purchaser of its property. The City, the United States, and the other riparian owners, shown on the Hammond plan, were joined as defendants. Subsequently the United States was dismissed as defendant, and was permitted to intervene as plaintiff. Jurisdiction is based on diversity of citizenship, the plaintiffs being corporations of New Jersey and Delaware respectively, and the defendants being citizens of the State of Maryland, except the Bankers Trust Company, a New York corporation. The bill prayed that the riparian rights of the parties be established, that the claims asserted by the City of Baltimore to the triangular area be rejected, and that the City be enjoined from making any fill in the waters of the Patapsco River south of the Hammond line. Answers were filed by the City denying the jurisdiction of the court, and by two other owners, the trustee in bankruptcy of Sanford and Brooks Company, and the Consolidated Gas, Electric Light and Power Company, who joined in the request for an adjudication of the riparian rights of all the parties. Decrees pro confesso were entered against the other defendants. The District Court held that the City had fixed the riparian lines, in accordance with the Hammond plan in 1928, and was estopped from making any further

firmed it in the decree. The City alone appealed.

It will be perceived that a decision holding that the City is estopped from claiming the area south of the Hammond line, does not necessarily affect the rights of any riparian owner in this area, except the Chemical Company. Such a decision would deprive the City of the right to use the triangular area, but the lines between the other properties could still be fixed by projecting their division lines on land into the river. We shall, therefore, first consider whether the City is estopped, and then decide whether it is proper in this case to go further as prayed in the bill and determine the respective riparian rights of all the parties to the suit.

As pointed out in the full discussion of the subject by the District Judge, (33 F. Supp. 881), the riparian rights of all the parties were derived from the State, as the owner of the beds of navigable streams within its boundaries. The State legislation long ago provided that riparian owners should be entitled to all accretions to the land by the recession of the water, and the exclusive right to make improvements into the water in front of their land. Code, 1939, Article 54, Sections 46, 47 and 48. The charter of the City authorizes it to establish lines in the Patapsco River beyond which no improvements may be made, and to regu-

late improvements so as to prevent injury to navigation or health. Baltimore City Charter (1938) Art. 1, § 6(8). The charter also provides for a Bureau of Harbors in the Department of Public Works, with the Harbor Engineer at the head, subject to the authority of the Chief Engineer of the City. Charter, Art. 1, § 105. The Harbor Engineer is given charge of the harbor, wharves and navigable waters; Charter, Art. 1, § 115; and no alteration or extension of wharves, bulkheads, or pilings in the river can be made without his consent. Charter, Art. 2, § 558. See also, Art. 15, § 15, Baltimore City Code, 1927.

The facts upon which the claim of estoppel is based must be considered against this legal background. The Chemical Company and the Aluminum Company bought their property in 1916. In 1917, the Chemical Company built its first pier in the river in the area between the side lines of its lot extended into the water. This pier was built by the Chemical Company without permission from any governmental authority; and it occupies a portion of the area later assigned to the Sanford & Brooks Company under the Hammond plan. Such was the situation in 1928 when, pursuant to an Act of the Maryland Legislature of 1927, the Mayor and City Council of Baltimore, by ordinance, authorized a bond issue, and also the acquisition by the Board of Estimates of property for the establishment of an airport, including any necessary riparian and aquatic rights. The land adjoining the Chemical Company was accordingly purchased. Permission of the War Department to fill in the area in front of the firm land of the City to a point beyond the bulkhead and pierhead lines established by the United States was requested in an application which covered a much greater area to the south than that included in the present airport; and the southerly bulkhead line in this application was drawn perpendicularly or nearly so, to the bulkhead and pierhead lines, that is to say, substantially in accordance with the Hammond plan.

Conferences took place between the Mayor and Chief Engineer of Baltimore City on the one hand, and the Aluminum Company, one of the original plaintiffs herein, on the other, in order to quiet an objection of the Aluminum Company to the issuance of the permit. As a result, the objection was withdrawn and the Aluminum Company was assured by the City officials that the north line of its riparian rights would coincide with the southern line of the City's. Permission to make the contemplated improvement was granted by the Government to the City on July 16, 1928. On November 10, 1928, the City applied for and was granted an amended permit reducing the airport to its present dimensions, and fixing the southern riparian boundary thereof, in accordance with the Hammond line. Two additional government permits, showing the same boundaries were granted to the City in 1929 and 1930. It was under these circumstances that the Hammond plan was prepared in 1928 showing the southern boundary of the airport as aforesaid, and also apportioning the riparian rights of all the properties on the shore from Colgate to Bear Creek by divisional lines in each case perpendicular to the bulkhead and pierhead lines. Copies of this plan were sent to all the riparian owners, asking for criticism, but none was received.

This work was done upon the order of the Chief Engineer of Baltimore City, Hammond's superior officer; but no ordinance of the Mayor and City Council formally adopting the plan was ever passed. Nevertheless, the City officials proceeded upon the assumption that the Hammond plan had been legally adopted. Work was begun upon the airport, and it was constructed upon boundaries that conformed to the plan. Moreover, the Harbor Engineer, noticing that the pier constructed by the Chemical Company in 1917 extended into the riparian field assigned to the Sanford and Brooks Company under his plan, called the officials of the Chemical Company into conference. They advised him that they desired to construct other bulkheads for filling out in front of their property, going out according to the deed lines. He informed them that this could not be done, and accordingly, in 1929 and 1933, when improvements were actually made by the Chemical Company, they were constructed in accordance with the lines of the Hammond plan. The work was done under permits approved by the Harbor Engineer and by the Board of Estimates of Baltimore City, the body composed of the Mayor, City Solicitor, Chief Engineer, Comptroller, and President of the City Council, which had purchased the airport property under a City ordinance. The improvements in 1933 consisted in the construction of a bulkhead at the expense of $15,000, and the deposit of 100,000 cubic yards of fill, and the construction in 1933 consisted in the erection of a

bulkhead at the expense of $20,000 and a fill of 150,000 cubic yards. The record does not show the costs incurred by the Chemical Company in transporting and putting the fills in place.

In 1934 the Harbor Engineer sent out notices to the various property owners of a meeting to adopt formally the necessary lines to define their riparian rights, in accordance with the Hammond plan. This led to the suggestion of certain changes and the preparation of a plat and a plan which adopted the Hammond plan as the basis of the allotment. It provided that the three properties nearest the airport, that is to say, the properties of the Chemical Company, the Sanford and Brooks Company, and the Gas Company (Dundalk), should have riparian rights as shown on the Hammond plan, and that the divisional lines south thereof should be somewhat modified.

There was no objection to this proposal until April, 1936, when the Chemical Company instituted suit in the federal court against the City for damages occasioned by the seepage of fill through the City's bulkhead into the waters in front of the Chemical Company's property. In the preparation of the defense to this suit the City was advised by W. Watters Pagon, a consulting engineer, that it was entitled to exercise its riparian rights in accordance with the deed lines, then for the first time called to the attention of the City officials. They were also advised that it was desirable to extend the airport in a southerly direction so as to increase the length of its runways. Pagon prepared a plan which did not follow either the Hammond lines or the deed lines, but shunted all the divisional lines to the south so as to include improvements of the Chemical Company within the City's airport. Thereupon they abandoned the Hammond plan and indicated that they intended to put the Pagon plan into effect and to deny all permits for improvements not in harmony therewith. It does not appear that the Pagon plan has been formally or finally adopted by the City; but the uncertainty produced by the change of attitude on the part of the City's representatives led to the institution of the pending suit.

The Chemical Company contends that these circumstances are sufficient to give rise to an estoppel against the City whereby it is prohibited from asserting that no City ordinance has ever been passed apportioning the rights of the property owners in the river in front of their properties.

This contention involves a consideration of the extent of the power of the City in its capacity as a municipal corporation to regulate the use of the waters of the harbor, and also the power of the City to bind itself in its proprietary capacity as the owner of property on the water front. We inquire first as to its power in its governmental capacity to establish the divisional lines. Article 1 Section 6(8) of the Baltimore City Charter, 1938, provides:

"The Mayor and City Council of Baltimore shall have full power and authority * * * to provide for the preservation of the navigation of the Patapsco River and tributaries, including the establishment of lines throughout the entire length of said Patapsco River and tributaries, beyond which lines no piers, bulkheads, wharf, pilings, structures, obstructions or extensions of any character may be built, erected, constructed, made or extended; * * * to erect and maintain and to authorize the erection and maintenance of, and to make such regulations as it may deem proper, respecting wharves, bulkheads, piers and piling, and the keeping of the same in repair, so as to prevent injury to navigation or health; * * * to provide for the appointment of such officers and employees as may be necessary to execute the aforegoing powers and to impose fines or penalties for a breach of any ordinance passed in conformity herewith."

The City contends that this enactment does not give it authority to establish divisional lines in the river. The argument seems to be that the power of the City is restricted to the establishment of bulkhead or pierhead lines, subject of course to the paramount authority of the United States in this respect, beyond which the improvements in the bed of the river may not be extended, and to the regulation of the character of the improvements to prevent injury to navigation or health. The terms of the quoted section are perhaps susceptible to this interpretation. But the Court of Appeals of Maryland has given a broader meaning to language contained in an earlier edition of the charter, that is substantially reproduced in the section now under consideration. In Classen v. Chesapeake Guano Co., 81 Md. 258, 31 A. 808, the court was called on to decide between conflicting claims of adjoining property owners fronting on a concave shore of the Baltimore harbor under a City ordinance which established divisional lines as well as bulk-

head and pierhead lines, as shown on an accompanying map. The court held that this ordinance was within the power of the City, saying: (81 Md. at page 266, 31 A. at page 809)

"The Patapsco river, in the city of Baltimore, is a navigable stream, and the power of the legislature, or of the municipality under its authority, to establish the lines within which wharves may be built, or other improvements made into the water, cannot be disputed. * * * But under the statutes now in force in Baltimore city, the Mayor and city council are authorized to prescribe the extent and mode within which riparian owners may make improvements in front of their lots, and, when they bound upon a concave shore, to declare what the front of a particular lot shall comprehend upon the bulkhead or port warden's line. Baltimore City Code, §§ 343, 351. * * * "

The articles (sections) of the Baltimore City Code referred to, were as follows:

"Section 343. The Mayor and City Council shall have full power to provide for the preservation of the navigation of the Patapsco River and tributaries, including the establishment of lines outside the limits of the city and within four miles thereof, beyond which no pier, bulkhead or wharf shall be built or extended, and for cleaning and deepening the harbor and docks, and for regulating the stationing, anchoring and mooring of vessels."

"Section 351. No wharf shall be run out, made, altered, enlarged or extended so as to divert the course of the channel, obstruct the harbor or basin, or to the injury of the same; and no person shall make, alter or extend any wharf without laying before the Mayor and City Council, or some person authorized by them, a plan of said wharf, and obtaining the consent of the Mayor and City Council, if in session, or of the joint standing committee of the City Council on harbor and the Mayor, when said City Council is not in session, if duly authorized so to act by the Mayor and City Council to carry the same into effect."

It will be observed that Section 343 now appears in substantially the same form in Article 1 Section 6(8) of the present charter quoted above. Section 351 is now reproduced in somewhat different form in Article 2 Section 558 of the Charter, which provides:

"No alteration, extension or removal of wharves, piers, bulkheads or pilings shall

be made in the Patapsco River or tributaries without consent of the harbor engineer."

It is obvious that Sections 343 and 351 conferred no greater power upon the City than the corresponding sections of the present code, and hence we are obliged by the Classen case to hold that the City now possesses the power to establish divisional lines in the waters of the river. See also, Cahill v. Baltimore, 173 Md. 450, 196 A. 305.

■ This conclusion compels the further holding under the Maryland decisions that the City will not now be heard to say that it has not fixed the boundary lines between its property and that of the Chemical Company in the waters of the river, in that the Hammond plan was not authorized or ratified by ordinance of the Mayor and City Council. The evidence shows that the plan was prepared by the Harbor Engineer under the orders of the Chief Engineer, and that the airport was actually constructed with its southern bulkhead erected upon the Hammond line. Moreover, the Chemical Company was forbidden to erect improvements in the river in accordance with the deed line, and has actually made improvements under permits from the City in the area from which the City now desires to exclude it. In short, the City is now insisting upon a line which under the Hammond plan it rejected.

These facts are sufficient to create an estoppel, which, under the Maryland decisions, the City cannot avoid by the plea that it did not exercise the powers conferred upon it in the proper fashion. In Rose v. Mayor and City Council of Baltimore, 51 Md. 256, 34 Am.Rep. 307, the validity of the purchaser's title to a market stall sold by the City was questioned because of the failure of the City to authorize the sale by ordinance. The suit was brought on notes given by the purchaser in part payment. The court said (51 Md. at pages 271, 272):

"But it is certainly true that there should be, in all cases, a previous ordinance directing the sales; as by the terms of the power it is contemplated that the judgment and discretion of the Mayor and City Council should be exercised, as to the manner of making the sales, and the term for which the stalls should be sold. However, in a case like the present, where the act done is strictly within the powers of the corporation, and could have been authorized to be done in the manner it has actually been done, but the corporation has failed to comply with some formality or regulation which

it should not have neglected, but which has in fact been omitted; in such case, after both parties to the transaction have acted and proceeded as if all preliminary formalities and regulations had been complied with, and rights have attached, the corporation itself could not be heard in a Court of justice to set up, with a view of defeating the rights of the other party with whom it has dealt, that it had neglected to observe some formality or regulation that regularly it should have observed before entering into the transaction in question. This principle of estoppel is applicable to corporations generally; * * * and it is equally applicable to a municipal corporation as to any other."

Again in Hagerstown v. Hagerstown Ry. Co., 123 Md. 183, 91 A. 170, 7 A.L.R. 1239, Ann.Cas.1916B, 1267, the City sought to enjoin the Railway Company from furnishing electric light and power to citizens, because the consent of the City to the exercise of the franchise had not been given by ordinance. The court held that the City was precluded from taking this position, because it had the power to grant the franchise and the Company had exercised the right by building a plant and operating appliances upon the streets, with the knowledge and consent of the proper municipal authorities. These decisions represent the Maryland law today on the point rather than the earlier cases to which the City refers, such as Baltimore v. Eschbach, 18 Md. 276; Baltimore v. Reynolds, 20 Md. 1, 83 Am.Dec. 535; State v. Kirkley, 29 Md. 85; Baltimore v. Musgrave, 48 Md. 272, 30 Am.Rep. 458.

We think, moreover, that the City is estopped in this case to repudiate the Hammond line, even if it did not possess the power to establish divisional lines in the waters of the river. The City was a property owner, and as such, had the undoubted power to make an agreement binding upon it and its next door neighbor, as to the division of riparian rights between them. The Hammond line may deprive the City or the Chemical Company of some part of the area to which it might be entitled under some other apportionment, but the settlement of that line between them need not affect the divisional lines between the other properties in the area. Consequently, the rights of the City as a property owner were affected by acts of its representatives, sufficient to give rise to an estoppel, even though the City in its governmental capacity had no power to establish divisional lines throughout the entire area.

■ There can be no doubt that the City holds the airport in its proprietary capacity. It has been decided that wharves and piers of the City are so held, Baltimore v. Steam Packet Co., 164 Md. 284, 164 A. 878; and the analogy to an airport seems to be complete and has been so regarded in other jurisdictions. Coleman v. Oakland, 110 Cal. App. 715, 295 P. 59; Mollencop v. Salem, 139 Or. 137, 8 P.2d 783, 83 A.L.R. 315; Mobile v. Lartique, 23 Ala.App. 479, 127 So. 257; Christopher v. El Paso, Tex.Civ.App., 98 S.W.2d 394; Blue v. City of Union, 159 Or. 5, 75 P.2d 977. In other jurisdictions also, the validity of agreements by municipal owners as to boundaries of riparian property has been upheld. Bergen Beach Land Corp. v. City of New York, 108 Misc. 70, 177 N.Y.S. 439, affirmed, 113 Misc. 491, 185 N.Y.S. 177; City of Los Angeles v. Borax Consolidated, Ltd., 9 Cir., 102 F.2d 52.

■■ We conclude that the decree of the District Court should be affirmed insofar as it directs that the riparian rights appurtenant to the property comprising the municipal airport be confined and bounded on the southeast side by the Hammond line. But we are not satisfied with the remaining portion of the decree which confirms in toto the divisional lines of the Hammond plan respecting all of the property in the area. We do not mean by this statement to sustain the contention of the City that the District Court did not have jurisdiction to decree a general distribution of riparian rights, because no controversy exists between any of the parties to the cause except the City and the Chemical Company. Nor are we impressed by the argument that the Consolidated Gas, Electric Light and Power Company, a Maryland corporation, showed by its answer that, like the plaintiff, it desired the establishment of riparian divisional lines and hence should have been aligned with the plaintiff, thereby destroying the requisite diversity of citizenship. The pending case resembles in some measure a suit respecting undivided interests, since the allocation to the individual riparian owners of space in front of an irregular or concave shore line cannot be made without considering the claims of all. In such a situation, parties often seek the same kind of relief against each other, but each seeks to protect his own interest and it does not follow that those who make common cause against a defendant must be aligned as parties plaintiff. In re Metropolitan Ry. Receivership (In re Reisenberg), 208 U.S. 90, 28 S.Ct.

219, 52 L.Ed. 403; Franz v. Franz, 8 Cir., 15 F.2d 797; German Savings & Loan Soc. v. Tull, 9 Cir., 136 F. 1, 11; Lewis v. Schrader, D.C.Tex., 287 F. 893; Republic Nat. Bank & T. Co. v. Massachusetts B. & Ins. Co., 5 Cir., 68 F.2d 445.

■■ A justiciable controversy, therefore exists, and the District Court is competent to decide it, if the question is ripe for judicial decision. We think, however, that this point has not yet been reached except as to the City and the Chemical Company. The riparian rights of the parties are derived from the common law, as modified by statute. In Baltimore & Ohio R. Co. v. Chase, 43 Md. 23, Judge Alvey described the common law rights of a riparian owner to accretions to his land and to access to the river by wharfing out from his property. But he pointed out, however, (43 Md. at page 35) that these principles of the common law "are subject to change and modification by the statute law of the State, and by the nature and circumstances of the grant by which the title may have been acquired to the land". As we have seen, such a statutory modification is found in the power conferred upon the City of Baltimore by its charter to establish the lines of improvements in the waters of the river; and, in our opinion, an exercise of this regulatory power is essential to the definition of the rights of adjoining property owners. Subsidiary to this power is the authority conferred upon the Harbor Engineer to grant permits for improvements in the harbor.

■ While the settlement of the respective riparian rights of adjacent property owners may be easy on a straight shore line, it becomes very difficult on an irregular shore line. See Baltimore & Steamboat Co. v. Baltimore, 104 Md. 485, 495, 65 A. 353; Councilman, Adm'x v. LeCompte, 21 A.2d 535, decided by the same court July 11, 1941. The difficulties inherent in the case at bar, especially if the divisional lines are fixed by projecting the deed lines into the river, are apparent from an inspection of the plat. There are indeed no general rules whose application will solve every case. See Freed v. Miami Beach Pier Corp., 93 Fla. 888, 112 So. 841. 52 A.L.R. 1177; Aborn v. Smith, 12 R.I. 370; Stuart v. Greanyea, 154 Mich. 132, 117 N.W. 655, 25 L.R.A.,N.S., 257. It is highly important in the harbor of a great city that the solution of such questions be made with regard not only to the rights of property owners, but also with regard to the safety and welfare of the public. To accomplish this end in the Patapsco River, the State has delegated the duty of decision to the City of Baltimore. This viewpoint was emphasized by Chief Judge Bond in Cahill v. Baltimore, 173 Md. 450, 196 A. 305, a controversy which involved the rights of adjacent property owners in the harbor of Baltimore. He said: (173 Md. at pages 459, 460, 196 A. at page 309).

"Two considerations of first importance need to be stated. The determination of the questions presented by this petition, those of the requirements of navigation in that part of the harbor, and possibly throughout a larger part, and the fair distribution of space into which riparian owners may be permitted to project wharves, is pre-eminently work for special officials made familiar with the demands of all navigation and all wharfing there, not for the processes of a court of law. And upon the basis of study by such officials, and their recommendations, then the problems are, under the system prevailing with respect to this harbor, problems for legislation. The full legislative power of the state, delegated as it is, has been given expression in the ordinance fixing the restriction of which the petition complains, and those ordinances could not be amended by the judicial power, however a court might be persuaded that amendment should be made. Cases of misuse of power, or unconstitutional exclusion of single owners from privileges generally accorded, may possible arise, and be found remediable by judicial action; but the present petition does not, in the opinion of the court, present such a case."

This case, it is true, related to the location of a pierhead line, fixed by City ordinance, and not to a divisional line. But if the City has the power in the premises, there is no difference in principle between fixing the distance from the shore beyond which the property owner may not wharf out, and fixing the side lines beyond which he may not intrude upon his neighbors. A more substantial difference between the cases is that in the instant case the City has not yet exercised its legislative power with respect to the divisional lines. So far as the Chemical Company is concerned, the City is estopped from basing an objection on this fact, but the City is not estopped as to other property owners who have made no improvements in the water with which the location of the airport will interfere. We think, therefore, that the settlement of the divisional lines between the properties must

await the action of the City, and that resort to the courts is not permissible unless the City refuses to act, or acts in such a manner as amounts to an abuse of power.

The decree of the District Court will be affirmed in part and reversed in part, and the case will be remanded to the District Court for further proceedings in accordance with this opinion.

Modified.

NORTHCOTT, Circuit Judge (concurring in part).

I concur in that part of the opinion holding the City of Baltimore estopped from denying that the line between the property of the City and the chemical company is the line fixed by the Hammond plan. I am further of the opinion that, as to all the property owners that are proper parties to this suit, the City is estopped from denying that the lines fixed by the Hammond plan are the proper lines.

As set out in the opinion the court below had jurisdiction, the parties were properly aligned and each litigant had its day in court.

In my opinion, the facts as detailed and undisputed make a clear case of estoppel against the City as far as disputing the lines fixed by the Hammond plan within the area in question. It is in accord with the effort to improve the administration of justice in the courts that controversies should be decided as speedily as possible. Here all the parties are before the court and there is no contention that any additional facts could be developed in subsequent litigation.

I am, therefore, of the opinion that the decree of the court below should be affirmed.