FEUDALE ET AL. *v.* SARLES ET AL.

[No. 118, October Term, 1947.]

*Decided March 31, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*John H. Herold,* with whom was *John H. Hessey* on the brief, for the appellant, Peter A. Feudale.

*Ward B. Coe,* with whom were *Albert J. Goodman* and *Carman, Anderson & Barnes* on the brief, for the appellants, E. J. Petrini and wife.

*R. Tilghman Brice, III,* for the appellees, Benjamin E. Sarles and wife and Benjamin R. Sarles and wife.

GRASON, J., delivered the opinion of the Court.

Spa Creek runs, generally, easterly between the City of Annapolis and the village of Eastport. It is a tidal stream and empties into the Severn River, an arm of the Chesapeake Bay.

Feudale (plaintiff below) owns two lots fronting on the south side of this creek, one of which was acquired in 1934, and the other, contiguous thereto, was acquired in 1946. The total frontage on said creek, of the two lots, is ninety-eight feet. Immediately east, and adjacent thereto, Petrini and wife (defendants below) own a lot, fronting fifty feet on said creek, which they acquired in 1946. Immediately west of Feudale's lots is Washington Street, which is about twenty feet wide. Immediately west of this street Benjamin R. Sarles and wife own a lot, fronting sixty-seven and four-tenths feet on said creek, acquired in 1941. Immediately west of this lot, and adjoining it, is a lot fronting seventy-two and six-tenths feet on Spa Creek, acquired in 1929 by Benjamin E. Sarles and wife. Immediately adjoining this lot, on the west, is a lot with a total irregular frontage on said creek of one hundred and fifty-one and one-tenth feet, which was acquired November 18, 1946, by Benjamin R. Sarles and wife and Benjamin E. Sarles and wife (defendants below). The properties of all of the parties to this suit are located on the south side of Spa Creek.

Benjamin E. Sarles and Benjamin R. Sarles are father and son, and are engaged in the boat repairing and storing business. Petrini is engaged in the same business. The lots of Petrini and Feudale, and the lots acquired by Benjamin R. Sarles in 1941, practically parallel the shore of Spa Creek. The lot acquired by the Sarles on November 18, 1946 (after this case was instituted) extends to the northwest, forming a curve. In 1929 Benjamin E. Sarles erected bulkheads and a pier, extending out from his property into the waters of the

creek about one hundred and sixty feet. In 1945 he extended his wharf forty feet and built an extension westerly, at right angles from the end thereof, thirty-eight feet long, and another extension easterly, at right angles with the old wharf, at a point five feet south of the end thereof, for a distance of ninety feet, and by the erection of water breaks along the north and east sides of the whole, made what is practically an inclosed basin wherein boats can be moored or stored, or repaired, as circumstances may dictate. In 1946 Petrini built a bulkhead in front of his lot, and erected a wharf or pier out into the waters of the creek for a distance, including the bulkhead, of approximately one hundred and sixty feet, and then turned easterly at right angles for about forty feet. These structures, built by Sarles and Petrini, extended into the creek at practically right angles from the shore.

When Sarles extended his pier easterly, in 1945, Feudale became somewhat concerned. Sarles had procured a permit from the Annapolis authorties and from the federal authorities to make this extension for a distance of one hundred and five feet easterly, but, at Feudale's suggestion, and to prevent objection by him, he only built this addition easterly ninety feet. Feudale then made no objection, and Sarles built his extension easterly for ninety feet.

In 1946 Petrini, after having procured a permit so to do from the federal and City authorities, proceeded to build a bulkhead and pier running from the northwest corner of his lot out into the waters of the creek at practically right angles from the shore line of his lot, one hundred and sixty feet. Petrini, after some work was done on this project, became apprehensive lest the extension out into the creek would extend over a line drawn straight out into the creek from the northwest corner of his lot, and the northeast corner of Feudale's lot. A survey was made and as a result thereof he removed the pier for two or three feet easterly and built it straight out from that point, so as to be sure that a line extending

out into the stream from the corner of his property and Feudale's property would not be crossed by his improvement.

Feudale saw all of this work done, and was concerned about it, but made no direct protest to Petrini. Later he became very much concerned lest further extensions into the creek by Petrini and Sarles would converge and he would be shut off from access to navigable water. He went to see the Annapolis authorities, and the federal authorities, and the State's Attorney for Anne Arundel County with reference to his rights, but received no definite information. He then instituted this suit. A demurrer to his original bill was sustained because there was no evidence that Feudale had made any improvement in the water in front of his lot. He told the court that he intended to wharf out, but he did not want to start work on the same until he knew exactly what his rights were and what he could legally do. The court sustained the demurrer, but permitted him to file an amended bill and set out the reason he had not made improvements in the waters of the creek in front of his land. This was done, answers were filed by the defendants, the case heard, and from the decree passed by the chancellor the case comes here on appeals by the defendants, Petrini and wife, and plaintiff below.

Under the decree Feudale is entitled to wharf out into the waters of the creek "in the space between a line drawn north 20 degrees 5 minutes east from the northwest corner of his said property, and a line drawn north 18 degrees 45 minutes east from the northeast corner thereof, as shown on the map hereto attached and made a part hereof." It enjoins Petrini and wife to "forthwith remove all that part of the bulkhead, wharf and pier recently erected by them in the waters of said Spa Creek, * * * which lies on the west, or northwest side of a line drawn north 18 degrees 45 minutes east from the northwest corner of their said property". The decree dismissed the amended bill as to the defendants,

Sarles, and decreed that costs be paid equally by Feudale and Petrini and wife.

The result of this decree is to establish the right in Feudale to wharf out from his property, not in a straight line parallel with the side lines of his property, but obliquely to the northeast. This results in requiring Petrini to remove a part of his bulkhead and practically all of his pier.

The *locus in quo* is within the territorial jurisdiction of the City of Annapolis. Section 1, McWilliams' Charter and Code of Annapolis, 1935, as amended. Section 29 thereof provides for appointment of wardens of the port, and sections 31 and 32 of the charter define the powers and duties of the port wardens. Section 31 provides:

"The wardens, or a majority of them, shall have power to determine upon and regulate all matters relating to the erection or building of wharves in the said port, so far as respects the distance said wharves may be extended into the water, * * * always keeping in view the preservation of the navigation of said port by not permitting any wharf to be carried out in such manner as to render the navigation of the same too close and confined, * * *."

Section 32 provides:

"No person holding lands on the waters of said port, nor any person whatever, shall build any wharf, or carry out any earth or other material for that purpose without license from said wardens, or a majority of them, to do the same; * * *.

Violation of this section "shall be subject to such fine as the Mayor, Counselor and Aldermen may ordain."

Section 33 provides:

"In all differences that shall arise between any citizen of Annapolis and the said wardens touching the discharge of their duty, an appeal shall lie to the Mayor, Counselor and Aldermen."

Article I, Section 6(8) of the Baltimore City Charter, 1938, provides that the Mayor and City Council of Baltmore shall have full power and authority:

"To provide for the preservation of the navigation of the Patapsco River and tributaries, including the establishment of lines throughout the entire length of said Patapsco River and tributaries, beyond which lines no piers, * * * or extensions of any character may be built, erected, constructed, made or extended; * * * to erect and maintain and to authorize the erection and maintenance of, and to make such regulations as it may deem proper, respecting wharves, bulkheads, piers, and piling, and the keeping of the same in repair, so as to prevent injury to navigation or health; * * * to provide for the appointment of such officers and employees as may be necessary to excute the aforegoing powers and to impose fines or penalties for a breach of any ordinance passed in conformity herewith."

Article II, Sec. 558 of said Baltimore City Charter provides:

"No alteration, extension or removal of wharves, piers, bulkheads or pilings shall be made in the Patapsco River or tributaries without consent of the harbor engineer."

Sections 343 and 351 of Public Local Laws; 1888, Article 4, gave the Mayor and City Council of Baltimore practically the same power it now possesses. Section 343 provided:

"The mayor and city council shall have full power to provide for the preservation of the navigation of the Patapsco River and tributaries, including the establishment of lines outside the limits of the city and within four miles thereof, beyond which no pier, bulkhead or wharf shall be built or extended, and for cleaning and deepening the harbor and docks, and for regulating the stationing, anchoring and mooring of vessels."

Section 351:

"No wharf shall be run out, made, altered, enlarged or extended so as to divert the course of the channel, obstruct the harbor or basin, or to the injury of the same; and no person shall make, alter or extend any wharf without laying before the mayor and city council, or some person authorized by them, a plan of said wharf,

and obtaining the consent of the mayor and city council, if in session, or of the joint standing committee of the city council on harbor and the mayor, when said city council is not in session, if duly authorized so to act by the mayor and city council to carry the same into effect."

The similarity of the sections of the present code referred to, and the sections of the old code referred to, of Baltimore City, and section 32 of the Annapolis code, is evident.

Section 47 of Article 54, Code 1939, provides:

"The proprietor of land bounding on any of the navigable waters of this State shall be entitled to the exclusive right of making improvements into the waters in front of his said land; such improvements and other accretions as above provided for shall pass to the successive owners of the land to which they are attached, as incident to their respective estates. But no such improvements shall be so made as to interfere with the navigation of the stream of water into which the said improvement is made."

This Act was originally passed in 1862, Chapter 129, section 38.

The history of legislation, and the decisions of this court under the various acts of the Legislature, are very fully given in *Mutual Chemical Co. v. Mayor and City Council*, D. C., 33 F. Supp. 881, and in *Mayor and City Council v. Canton Co.*, 186 Md. 618, 47 A. 2d 775, 778, and will not be repeated here. In the latter case Judge Markell, speaking for this court, said:

"The delegation of power of governmental regulation for these two purposes ((a) to preserve navigation and (b) to ration space for 'improvements') was complete in the original charter of 1796, including the former 'powers and authorities' of the port wardens under the Act of 1783. * * *. The rights of riparian owners subject to such governmental regulation, were reaffirmed in the Act of 1784. * * *. Under the Act of 1862 such rights are substantially the same as under the Act of 1745, but are further protected by the provisions of sec-

tion 48, art. 54, Code of 1939: 'No patent hereafter issued out of the land office shall impair or affect the rights of riparian proprietors, as explained and declared in the two preceding sections; and no patent shall hereafter issue for land covered by navigable waters.' We shall assume, without deciding, that section 48 could be repealed, and also section 47 to the extent that improvements have not actually been made.

"Under the Act of 1745—or 1862—'the riparian owner had no vested title to the land covered by water immediately in front of his property, nor to the improvements built out of the water, until the improvements had been actually completed. *Giraud's Lessee v. Hughes,* 1 Gill & J. 249.' *Brady v. Baltimore,* 130 Md. 506, 510, 101 A. 142, 143; *Cahill v. Mayor and City Council of Baltimore, supra,* 173 Md. [450], 456, 196 A. 305. The required consent of the city agencies was given by the establishment of limiting lines. The power to establish such a line includes power to change it. The right to build piers to a particular pierhead line, conferred by an ordinance of 1880, 'was a privilege subject to revocation at any time before it was acted upon, and the ordinance of 1881, which repealed all ordinances inconsistent therewith (and established a new line), was a revocation of this privilege.' *Classen v. Chesapeake Guano Co.,* 81 Md. 258, 267, 31 A. 808, 809; *Cahill v. Mayor and City Council of Baltimore,* \* \* \* 173 Md. [450], 456, 457, 196 A. 305.

"Subject to such governmental regulation by the city (and by the federal government), the riparian owner's rights to make improvements in the water was 'a franchise; a vested right, peculiar in its nature; a quasi property, of which (he) could not lawfully be deprived, without (his) consent.' *Casey's Lessee v. Inloes,* 1 Gill. 430, 501, 39 Am. Dec. 658; *Baltimore & O. R. Co. v. Chase,* 43 Md. 23; *Horner v. Pleasants,* 66 Md. 475, 477, 7 A. 691; *Brady v. Baltimore,* 130 Md. 506, 510, 511, 101 A. 142. Riparian owners had the right 'to extend or improve out (their) lot *to the limit prescribed by the city au-*

*thorities,* and according to the well settled law of this State, they could not be deprived of this right without their consent.' (Italics supplied.) *Mayor, etc., of Baltimore v. St. Agnes Hospital,* 48 Md. 419, 421. 'These rights, thus secured, (by the Act of 1862) are valuable; they are property, according to repeated decisions; and of which the owner cannot be deprived without his consent or by other competent legal means. *Dugan v. Mayor, etc. of Baltimore,* 5 Gill & J. 357, 367; *Casey's Lessee v. Inloes,* 1 Gill 430, 501, 39 Am. Dec. 658; *Baltimore & O. R. Co. v. Chase,* 43 Md. 23; *Buccleugh v. Met. Board of Works,* 5 H. L. 418. And whenever those rights are invaded, or their enjoyment obstructed, the owner is entitled to his remedy for redress, as in other cases of the violation of the rights of property'. *Garitee v. Mayor, etc., of Baltimore,* 53 Md. 422, 433; *Culley v. Hollis,* 180 Md. 372, 374, 375, 25 A. 2d 196. When riparian property is taken by the city, compensation must include the value of these rights. *Marchant v. Baltimore,* 146 Md. 513, 126 A. 884. In *Tome Institute v. Crothers,* 87 Md. 569, 40 A. 261, 266, it was held that a riparian owner could sell his 'water privilege' under the Act of 1824, ch. 33, and retain his land. The Act of 1824 gave to riparian owners at Port Deposit 'a right of the same description' as the right to improve under the Act of 1745."

In *Mayor and City Council v. Crown Cork & Seal Co.,* 4 Cir., 122 F. 2d 385, 392, the decision of the District Court in *Mutual Chemical Co. v. Mayor and City Council,* 33 F. Supp. 881 was reviewed. In that case the court dealt with apportionment of water frontage on the Patapsco River, situate on a concave curve between Colgate Creek on the north and Bear Creek on the south, in the harbor of the City of Baltimore. All of the owners of land abutting on this curve were made parties. The city owned the northernmost tract, on which it intended to build an airport, and adjoining thereto was the land of the Mutual Chemical Company. The Chemical Company wharfed out from its lateral lines and built a bulkhead and a pier. Its westernmost line coincided with

the easternmost line of the city property. The city authorities agreed with the property owners on a given line, and relying thereon, some of the property owners wharfed out from their respective properties. Thereafter the city repudiated the agreement and established a different line. The appellate court held that the city was estopped from changing the original line, except as to "owners who have made no improvements in the water with which the location of the airport will interfere. We think, therefore, that the settlement of the divisional lines between the properties must await the action of the City, and that resort to the courts is not permissible unless the City refuses to act, or acts in such a manner as amounts to an abuse of power."

We think that the power to regulate the building of piers in that part of Spa Creek (a navigable stream) within the territorial limits of Annapolis, is similar to the powers which the City of Baltimore exercised in regard to the building of piers in the basin of the Patapsco River, which it possessed under the Public Local Laws of 1888, and now exercises under its present charter.

In *Mayor and City Council v. Crown Cork & Seal Co.,* *supra,* it was specifically held that an owner of property fronting on the Patapsco River, in Baltimore City, must first apply to the city for permission to wharf out—or at least for settlement of divisional lines for that purpose—before he can resort to the courts, and the courts will only review the matter upon a showing of abuse of power by the city.

In *Cahill v. Mayor and City Council of Baltimore,* 173 Md. at pages 459, 460, 196 A. at page 309, Chief Judge Bond said:

"The full legislative power of the state, delegated as it is, has been given expression in the ordinance fixing the restriction of which the petition complains, and those ordinances could not be amended by the judicial power, however a court might be persuaded that amendment

should be made. Cases of misuse of power, or unconstitutional exclusion of single owners from privileges generally accorded, may possibly arise, and be found remediable by judicial action; but the present petition does not, in the opinion of the court, present such a case."

The erection of the piers into Spa Creek by Petrini and the Sarles does Feudale very little damage, if any. The situation existing at the time this suit was instituted does not show that Feudale was in any immediate danger of suffering any harm in regard to his riparian rights. It required no immediate court action to preserve his rights. There was no reason why he should not have applied to the port wardens of Annapolis, as well as to the federal government, for permission to wharf out. These regulations of the Annapolis charter, as we have said, are similar to the regulations of the Baltimore charter, and the court will not take action in a case such as this, unless the municipal authorities to whom the matter is committed act arbitrarily or otherwise abuse their power. Feudale did not apply to the municipal authorities for permission to wharf out. He acquiesced in everything that Petrini did. To require Petrini, in these circumstances, to tear down his pier, as the decree requires him to do, would seem to be unjust, even though Petrini acted before he was advised as to his rights.

We are of opinion that under the circumstances of this case the lower court should not have undertaken to establish new divisional lines between the parties.

If it appears in the future that either the Sarles or Petrini attempt to extend their respective piers farther out into the waters of the Creek, to the material detriment of Feudale, the court's jurisdiction may be invoked. If the present condition and location of the two piers in question, or either of them, is changed in the future, in such a way as to materially interfere with the rights of Feudale, even if the Annapolis officials should approve the change, there can be no question that Feudale would have a right to apply to the courts for relief.

256

With this view of the case, it is unnecessary for us to pass upon the other questions presented at the agrument or in the briefs.

> *Decree reversed and bill dismissed. Costs to be paid equally, one-third by Feudale, one-third by Petrini and wife, and one-third by Benjamin R. Sarles and Benjamin E. Sarles and their respective wives.*