**UNITED STATES v. BELT et al.**

No. 8601.

United States Court of Appeals
District of Columbia.

Argued April 4, 1944.

Decided May 15, 1944.

Mr. Norman MacDonald, of Washington, D. C., with whom Messrs. Norman M. Littell, Assistant Attorney General, and Alex H. Bell, Jr., all of the Department of Justice, of Washington, D. C., were on the brief, for appellant.

Mr. Walter M. Bastian, of Washington, D. C., with whom Mr. Milton D. Campbell, of Washington, D. C., was on the brief, for appellees.

Before GRONER, Chief Justice, and MILLER and EDGERTON, Associate Justices.

GRONER, C. J.

This is an appeal from a final judgment in a suit brought by the United States to quiet title to certain lots of land bordering the Anacostia River in the District of Columbia. The complaint prays that the court decree the absolute and paramount title of the United States to the land and land under water embraced in Square 666, and remove therefrom any cloud cast thereon by the claims of the defendants (appellees).

The District Court held that the United States had no right, title or interest in any of the lands included in Square 666 and dismissed the complaint.

The case arises out of circumstances attending the establishment of Washington City as the Capital of the United States. These circumstances are graphically described in the opinion of the Supreme Court in Morris v. United States, 174 U.S. 196, 19 S.Ct. 649, 43 L.Ed. 946; and reference to what is said there will avoid the necessity of restatement here. The complaint sets out that the City was laid out in accordance with plans which provided for

a certain public street (called Water Street), as a binding external and marginal boundary along the courses of the Potomac and Anacostia Rivers, and that title to the land forming the street and that lying between the street and the mesne high water line of the rivers then and there became and is now vested in the United States in fee simple.

Unquestionably, the complaint was drawn to bring the case within the doctrine of the Morris case. There property owners, claiming riparian rights in the Potomac River frontage, were the owners of lots overlooking the River, but located on the shoreward side of Water Street, the street and the unplatted land along the river front being on the water side of their lots and separating them from the high water line of the River. The question in the case was whether, notwithstanding these physical facts, they were entitled to prolong the side lines of their lots over and across the street and into the water. The decision was that the platting and laying out of the street between the lots and the River disclosed the obvious purpose of the founders of the City to reserve the river front and access to the navigable water to the use and benefit of *all* the citizens of the new City.

Appellees in the present suit are the owners of the land now known as Square 666, which at the time the City of Washington was laid out was within the Town of Carrollsburg. The lots embraced in this block, as then laid out, faced on a street of Carrollsburg called Union Street, and extended back therefrom eastwardly to the Anacostia River. In consequence of this, it is claimed, and not denied, that the then owners were vested with all the rights of proprietors of land along a navigable water course. These owners, the record shows, were unwilling to convey their lands to the United States on the same terms and conditions as had previously been agreed to between Commissioners acting for the United States and other owners of the lands to be included in the boundaries of the City, but insisted upon and obtained agreement, in consideration of the dedication of their property to the uses of the proposed City, that *one-half* the quantity of land conveyed by them to the United States should, on the completion and adoption of the plan of the City, be reassigned and reconveyed as near their old locations as was practicable. Accordingly, the Commissioners replatted a part of the Carrollsburg lots

into Squares 665 and 666 and reconveyed to each former owner one lot in Square 665 and one lot in Square 666 of thirty-foot frontage, for each of the Carrollsburg lots of sixty-foot frontage,—the depth of the new lots being approximately one-half the depth of the old—and this division of lots and the location of each in the respective squares were then shown on the plat of the City, known as the Dermott Plat, officially approved and ratified by the President, in accordance with appropriate provisions of the applicable Act of Congress.

There is actually no dispute between the parties here that the lots embraced in this litigation are shown by metes and bounds on the Dermott Plat, as included within the area of Block 666, and equally no dispute that Block 666 is shown as lying on the *eastern* or water side of Water Street, and the lots therein as extending thence eastwardly from the street into the River; and there is no dispute that the lots in question were in 1793 assigned by the Commissioners appointed for that purpose to appellees' predecessors in title in fee simple.

The position of the United States here is that, notwithstanding this, the Commissioners, in making conveyances of the lots, either dealt with land altogether lying and being below the high water mark of the River,—i. e., not fast land—or to the extent, if any, that there was fast land, granted merely a water privilege or revocable license for wharfing or other use of the water, "and that said license or permission, if any, was and remained servient to and subject to the exercise of rights under its sovereign and paramount title by the United States."

The case was heard below by District Judge Laws, who wrote an opinion (47 F. Supp. 239) and made findings of fact and conclusions of law, in part, as follows:

"1. In March 1793, defendants' predecessors in title were the owners of certain lots in the town of Carrollsburg, bounded on the Eastern Branch or Anacostia River within the limits of the City of Washington, a part of which lots were included in Square numbered 666 by the Commissioners appointed for laying out the Federal City.

"2. That the original proprietors of said lots had refused to convey the same to the trustees appointed to receive deeds in trust of the lands embraced within the City of Washington when such deeds of trust were executed by original proprietors of lands

within said limits in March 1791, but thereafter in March 1793 did execute deeds in trust to said trustees containing the following provision in lieu of that appearing in the conveyances theretofore executed:

" 'To have and to hold the hereby bargained and sold lots, pieces, and parcels of ground with their appurtenances, * * * To and for the special trusts following and no other, say, that all the said lots, pieces, and parcels of ground hereby bargained and sold, be laid out together with the other lands and designated for that purpose, for a Federal City, with such streets, squares, parcels, and lots as the President of the United States, for the time being, hath approved or shall approve; * * *. And that one-half the quantity of the said lots, pieces and parcels, hereby bargained, and sold, shall be assigned and conveyed as near the old situations, as may be to him the said Charles Carroll of Carrollton, his heirs, and assigns, in fee simple, so that he shall have made up to him one-half of his former quantity and in as good a situation; * * *.'

"3. That in part consideration thereof said Commissioners, pursuant to the provisions of said deeds in trust, allotted and conveyed to defendants' predecessors in title all of the lots in Square 666 except lots 2, 6, 7, 8 and 10 in said Square, which last enumerated lots were on September 16, 1793, ordered by the President of the United States to be sold by the Commissioners, and were thereafter sold by said Commissioners and deeds conveying the same executed and delivered to purchasers, whose title so obtained has also devolved upon the defendants.

"4. The Court finds that at the time of the laying out of said Square 666 by the Commissioners, the division of the same, and the conveyances of the lots therein to defendants' predecessors in title, said Square consisted of fast land bounded by Water Street on the west and the waters of said Eastern Branch or Anacostia River on the east.

"5. That is (it) was the intention of the United States Commissioners, upon the division and assignment of the several lots in Square 666, to grant to the owners of the lots in Carrollsburg for which the lots in Square 666 were substituted in exchange an estate in fee simple, and not, as plaintiff contends, their intention to grant merely a revocable water privilege or license to wharf out to the channel in connection with

the same proprietors' ownership of the lots in Square 665.

"6. The Court further finds that in the laying out of that part of the City of Washington which is bounded by the Eastern Branch, the dividing of the same into squares and lots and in making division of such lots adjacent to the said Eastern Branch with the original proprietors, and in the sale of the public lots remaining after such division, a general plan of bounding the city on that front by a street separating privately owned property from the waters of the Eastern Branch was not adopted or followed."

## "Conclusions of Law

"1. That the defendant, Rigel O. Belt, is the present owner in fee simple of all of the Square 666 subject only to the liens of the several deeds of trust described in the complaint.

"2. That the certificates issued and conveyances made by the Commissioners for laying out the Federal City, under the direction of the President, vested in the original proprietors of the said lots in Square 666 other than lots 2, 6, 7, 8 and 10, and the subsequent sales of the last mentioned lots vested in the purchasers at said sales the fee simple titles to the respective lots including riparian rights in waters of the Eastern Branch.

"3. That the United States, plaintiff herein, has no right, title, or interest in any of the lands included in Square 666.

"4. In view of the findings of fact and conclusions of law as set forth herein the plaintiff's bill of complaint should be dismissed with prejudice."

 If the findings of the trial court are warranted in the evidence, obviously, it is our duty to accept them, and we have therefore been at pains to examine the record carefully to the determination of that question, and also that we might review in proper perspective the question of law on which the conclusion is based.

The Maryland Act of 1788, c. 46, ceded to the United States the territory which is now the District of Columbia. And the Ratifying Act of Maryland of 1791 declared that the territory ceded should be held in full and absolute right, and exclusive jurisdiction, as well of soil as of persons residing or to reside thereon; "Provided, That nothing herein contained shall be so construed to vest in the United

States any right of property in the soil as to affect the rights of individuals therein, otherwise than the same shall or may be transferred by such individuals to the United States." [1]

Congress by Act of July 16, 1790, [2] accepted the cession for the seat of government and authorized the President to appoint commissioners to define its limits and to provide suitable buildings for the accommodation of Congress, for the President and for the public offices of the Government. The President was empowered to accept grants of money for this purpose. At this time the land which subsequently became the District of Columbia was largely farm acreage. An exception to the character of land was the town settlement called Carrollsburg, which had been established in 1770 by Charles Carroll of Carrollton, and laid off into streets and blocks and lots. The Commissioners very early after the passage of the Act of Cession reached agreement with the owners of farm lands, as the result of which these lands were acquired—without money consideration—under agreements providing that the Commissioners should use the lands in laying out streets and squares for the new City, the portion not so used to be divided into blocks and lots and these in turn to be divided equally, but without regard to location, between the United States and the former owners. But the Commissioners were unable to make like agreements with the owners of Carrollsburg lands. That little settlement was at the time located on the Anacostia River, near its junction with the Potomac, and extended along the River for a considerable distance in a northerly direction. Its lands were then owned in fee by sundry persons unwilling to part with them on the terms made by the Commissioners with the owners of farm lands. This attitude of the Carrollsburg owners forced the Commissioners, with the approval of the President, to make a separate and different agreement with them. This provided that each lot owner should get back "one-half the quantity of the said lots, pieces and parcels, hereby bargained, and sold * * * as near the old situations as may be," so that each owner "shall have made up to him one-half of his former quantity and in as

good a situation," and if this could not be accomplished, he should have compensation in money in lieu of land.

The task of laying off the new City was first entrusted by General Washington to Major L'Enfant, who made a map of streets, boundaries and parks, but who was discharged before approval of his plan. He was succeeded by Major Ellicott, who likewise made a plan which, as it subsequently appeared, was both incomplete and unapproved. Both L'Enfant's and Ellicott's plans showed a binding street on the water front of the Potomac and Anacostia Rivers and both plans were made prior to the agreement between the Commissioners and the lot owners of Carrollsburg. Major Ellicott was succeeded by James Dermott after the Carrollsburg agreement. He was directed by the Commissioners to make a resurvey and plat of the lands within that town. This new layout he was directed to superimpose on the large plat to embrace when completed the entire area of the new City. This he did and his plat, with streets and squares and lots shown thereon, was adopted by the President and became the officially approved map of the City of Washington. [3] The Dermott plan, like the L'Enfant and Ellicott plans, showed a binding street along the *Potomac River,* separating the platted squares or blocks from the water, and it was on this basis, as we have seen, that the Supreme Court in the Morris case held against the claim of riparian rights in lot owners located in such blocks on the landward side of this street. But the Dermott plan, which the Supreme Court in the Morris case found to be the official plan, does *not* show a binding street along the *Anacostia River,* but, on the contrary, shows the extension of Water Street as it runs through the former town of Carrollsburg, as located on the landward side of certain squares divided into lots binding on the river front, and one of these squares is 666, in issue here. That this was neither accidental nor inadvertent is shown by the fact that the boundaries of this square are carried in the Commissioners' minutes as on the north by T Street, south by U Street, northwest by Water Street, and southeast by Eastern Branch (Anacostia River). And when the lots in this square were divided, the owners

---

[1] D.C.Code 1940, p. XXIX, Acts Md. 1791, c. 45.

[2] D.C.Code 1940, p. XXXI, 1 Stat. U.S. c. 28, p. 130.

[3] Morris case, supra, 174 U.S. at page 256, 19 S.Ct. at page 673, 43 L.Ed. 946.

of lots formerly embraced within its area were allotted, under the agreement, half of the same land which they had conveyed to the new City, and the lots retained by the Commissioners as the half to which the United States were entitled, were sold and conveyed in fee to appellees' predecessors in title. All of this is definitely shown in the Commissioners' minutes of March 19-25, 1794, as follows:

"According to notice given agreeable to law the Commissioners proceeded to the assignment and allotment of one-half of the quantity of each lot of ground in Carrollsburg and Hamburg and continued the same at convenient times, until completed, and then granted certificates for the same.

\* \* \* \* \*

"The Commissioners have for the public a right in one-half of those water lots. They are willing to dispose of that part.

\* \* \* \* \*

" \* \* \* So circumstanced the Commissioners can positively agree for the public interest in the water lots only which they offer at the rate of 200 pounds to each and the public interest in the rest of the lots in the four squares at 100 pounds each \* \* \*."

◼ In the court below much of the evidence in behalf of the United States was designed to show that, notwithstanding what has just been stated, the high water line of the Anacostia River ran *in part* to the west of the lots embraced in Square 666; but there was evidence on behalf of appellees to the contrary, and the trial judge found as a fact that "at the time of the laying out of said Square 666 by the Commissioners, \* \* \* said Square consisted of fast land bounded by Water Street on the west and the waters of said Eastern Branch or Anacostia River on the east." A review of the evidence, together with our own view of the land in its present condition,[4] convinces us this finding is correct. That there was in 1794 fast land to the east of Water Street as it parallelled the Anacostia River is too clearly shown to be thought to be in doubt.

From all of this it is manifest that, notwithstanding—as the Supreme Court declared in the Morris case—the purpose of the Commissioners and President Washington, in laying out the City with a public street along the meander line of the Potomac River was to reserve the riparian rights in the River to the public, that the purpose was abandoned in relation to a portion of the City bounding on the Anacostia. And it is a fair and almost necessary conclusion that this was so because of the unwillingness of lot owners in Carrollsburg to convey their water front property to the Government on any other terms than the retention by them of one-half of their original frontage. Accordingly, the lot owners along the Anacostia River demanded and received back lots in half the quantity surrendered, bordering on the River; and at or about the same time acquired by purchase, evidenced by the Commissioners' certificates, the same rights in the remaining lots in Square 666 which, as we have shown, the Commissioners offered for sale and sold. And this retransfer in the one case and purchase in the other, the Ratifying Act of Maryland of 1793, c. 58, declared, shall be sufficient and effectual to vest the legal estate in the purchasers, their heirs and assigns, according to the import of such certificates. Van Ness v. Mayor, Aldermen and Board of Common Council of City of Washington, 4 Pet. 232-285, 7 L.Ed. 842.

◼ That this conclusion is correct is obvious in the fact that this right of riparian ownership has been recognized by the authorities of the District of Columbia from that day to the time when it was determined to commence this litigation. For all of that time appellees and their predecessors have been the officially recognized owners of the lots in question and have paid taxes on the same. Nor does it clearly appear to us from the averments in the complaint that the United States, even now, deny that this is true, but rather place their claim to superior rights upon a theory that the Commissioners in conveying the land under water intended "to assign or grant a water privilege only, \* \* \* which privilege \* \* \* was a mere revocable license or permission for wharfing or other purposes incident to the water of the Anacostia River." If by this we are to understand that counsel mean that by cession from Maryland the United States obtained title to all the land embraced within the cession, such a contention would be manifestly untenable, for it is specifically

---

4 With the consent and agreement of counsel for both sides, and in their presence, the judges of this court went upon and viewed the property in its relationship to the course of the River.

declared in the Act of Ratification that nothing therein contained shall be construed to vest in the United States any right of property in the soil or affect the rights of individuals therein otherwise than the same shall or may be transferred by such individuals to the United States. If, on the other hand, counsel mean only that as to the portion of the land below high water, the United States, under the cession from Maryland and by virtue of the powers surrendered by the States under the Constitution, may exercise their discretion in the use thereof in the public right of fishing, or in the promotion of commerce and navigation, there would be no dissent, for that principle is too firmly established to be questioned. Hence, we think it is clear that the United States got title to the land embraced within the area of the District only by virtue of conveyances made by the former owners. And it is just as clear that to the extent the United States reconveyed these lands to former owners, in fee, the latter reacquired title against the world. This latter result follows from the provisions of the Ratifying Act, wherein it is provided that the returned lots or parcels are to be held according to the legal import of the assignments or conveyances made by the Commissioners.[5]

■■■■ So also there can be no manner of doubt that while the Carrollsburg proprietors of lots binding the high water line of the Anacostia River continued to own such lots, they were entitled to the riparian rights appurtenant thereto, and that these rights were preserved and passed to the subsequent owners of these lots in the transaction we have referred to. Potomac Steamboat Co. v. Upper Pot. S.B. Co., supra, 109 U.S. at page 686, 3 S.Ct. at page 453, 27 A.L.R. 1070. The extent of the right is declared in Baltimore & O. R. Co. v. Chase, 43 Md. 23, to be the right to access to the navigable part of the River, with the right to make a landing, wharf, or pier, subject to such general rules and regulations as the State may think proper for the protection of the public. And in turn this right of regulation by the State of Maryland in the public interest, the United States succeeded to in the establishment of the District of Columbia, in consequence of which the common law rights of a riparian owner, within the limits of the District, are subject to change and modification by Act of Congress to the same extent and with the same limitations that change or modification might have been made by Maryland while the land was within its boundaries. In addition, Congress under the commerce clause possesses a paramount power over the navigable waters of the United States in the regulation of commerce and navigation. As a result of these well recognized limitations or subordinations, the right of a riparian proprietor may be properly described as a qualified right (cf.: Greenleaf-Johnson Lbr. Co. v. Garrison, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939), though it is universally agreed that the right is property and that though it must be enjoyed in subjection to the rights of the public, it cannot arbitrarily be destroyed or impaired.[6]

But we have no need to discuss this question in detail in the facts of this case, since, as it happens, the United States have now established harbor lines in front of appellees' property and are not threatening to change or modify them nor, so far as we are able to see, are appellees seeking to exercise their rights as riparian proprietors by the extension of their land into the water by wharves or piers. For present purposes it is enough to say that appellees, or their predecessors in title, acquired the lands in suit extending, as we have found, from the easterly line of Water Street to the high water mark of the Anacostia River, and as a result are riparian proprietors, with all the rights and privileges appertaining to such riparian property.

Affirmed.

---

[5] Potomac Steamboat Co. v. Upper Pot. S.-B. Co., 109 U.S. 672, 681, 3 S.Ct. 445, 27 L.Ed. 1070.

[6] Yates v. Milwaukee, 10 Wall. 497, 19 L.Ed. 984.