**MARTIN v. STANDARD OIL CO. OF NEW JERSEY et al.**

**STANDARD OIL CO. OF NEW JERSEY v. MARTIN et al.**

Nos. 10969, 10970.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 14, 1952.

Decided June 19, 1952.

Daniel Partridge, III, Washington, D. C., for Lottie May Martin, appellant in No. 10969 and appellee in No. 10970.

John J. Courtney, Washington, D. C., for Standard Oil Company of New Jersey, appellee in No. 10969 and appellant in No. 10970.

Oliver Gasch, Asst. Corporation Counsel for the District of Columbia, Washington, D. C., with whom Vernon E. West, Corporation Counsel, Chester H. Gray, Prin-

cipal Asst. Corporation Counsel, Stanley DeNeale, Asst. Corporation Counsel, and John F. Doyle, Asst. Corporation Counsel, Washington, D. C. were on the brief, for appellee District of Columbia.

Warren E. Magee, Washington, D. C. with whom Burdette M. Asbill was on the brief, for appellee Gulf Oil Corporation.

Before EDGERTON, CLARK, and PRETTYMAN, Circuit Judges.

EDGERTON, Circuit Judge.

Appellant Lottie May Martin asks an injunction to require the Standard Oil Company of New Jersey (Standard) and the Gulf Oil Corporation (Gulf) to remove a pier and piles in the Anacostia River in the District of Columbia. The controversy concerns the location of the wharfing rights of riparian owners. It arises from the fact that the dry-land boundaries between the riparian lots do not run at right angles to the river. While these boundaries are straight and run east and west, the river curves and runs generally southwest or, more nearly, west of south.

Martin owns lots 6, 7, and 8 in Square E of 664, at the corner of South Capitol and S Streets. Her land is bounded on the north by S Street, which runs east to the river. Her south boundary also runs east to the river. She says these boundaries continue due east into the river, either to the "channel" or to the bulkhead line established by the Secretary of War (now the Secretary of the Army) pursuant to the Rivers and Harbors Act of 1899, 30 Stat. 1151, § 11, 33 U.S.C.A. § 404, as amended 37 Stat. 206, 33 U.S.C.A. § 405. Martin's wharf runs into the river beyond the bulkhead line. It was built or rebuilt in 1931. Martin contends that a pier and piles that Standard and Gulf erected in 1946 encroach on her riparian area.

Appellee Gulf owns lot 4 in Square S of 708 which is bounded on the south, and therefore separated from Martin's land, by S Street. Standard owns lots 1, 2, and 3 in Square S of 708, directly north of Gulf's lot. These lots, like Martin's, run down to the river. In the 1930s Gulf, with the approval of the United States Engineers and

with a building permit from the District of Columbia, built a wharf and dock. At the bulkhead line, the wharf is between the intersections of that line with Gulf's lot lines. It runs into the river at right angles to the bulkhead line. The dock at the end of the wharf runs at right angles to it in the direction of S Street.

In 1944 Standard conveyed land to the District for abutments of the South Capitol Street Bridge. This made useless a wharf that Standard had built in front of its land. The District therefore agreed to, and did, permit Standard to extend the Gulf dock, between lines drawn at right angles to the bulkhead line and intersecting that line where the boundaries of S Street intersect it. Gulf authorized Standard to make this extension. The United States Engineers approved the permit. The extension was built in 1946.

The District Court dismissed Martin's complaint. It found that the Gulf-Standard structure did not encroach on her riparian area. It found that her riparian area lies "within lines drawn from points where the northerly and southerly lines of [her] Lots * * * extended due east intersect the present bulkhead line and running thence at right angles to the said bulkhead line between parallel lines to the channel * *." This finding conforms to the so-called Hazen plan which we discuss below.

Both Martin and Standard appeal; Martin on the theory that her riparian boundaries are projections of her lot lines from the bulkhead line to the pierhead line, Standard on the theory that though Martin's complaint was rightly dismissed, riparian boundaries should have been found by projection from the points where lot lines cross the high water mark of 1794 and not from the points where they cross the bulkhead line. On Martin's theory, but not on either the District Court's or Standard's, the Gulf-Standard dock extends into Martin's riparian area. Standard concedes that its rights are not directly affected by the District Court's judgment.

I. *Projection of lot lines: the Dermott plat.* When Washington was laid out in the early 1790s, Square E of 664 was part

of Carrollsburg on the Anacostia River or, as it was then called, the Eastern Branch. Martin's predecessors conveyed land in Carrollsburg to trustees who in turn, by agreement, conveyed it to land commissioners for use in laying out the new city. In 1794 the grantors received in return land equal in area to the land they gave up and "in as good a situation", i. e. bordering on the river. United States v. Belt, 79 U.S.App.D.C. 87 at page 91, 142 F.2d 761 at page 765. In 1792 Major Ellicott, surveyor to the land commissioners, prepared a plan of Washington that showed wharves extending into the river at right angles to the shore line, but this plan was never approved. The land commissioners directed Dermott, who succeeded Ellicott in 1793, to resurvey and plat the Carrollsburg lands. Dermott's plat showed the boundaries of the shore lots as continuing due east into the river. Morris v. U. S., 174 U.S. 196, at 221, 19 S.Ct. 649, at page 661, 43 L.Ed. 946. President Washington approved Dermott's plat in 1797. 174 U.S. at 256, 268, 19 S.Ct. at pages 673, 677, 43 L.Ed. 946. 79 U.S.App. D.C. 91, 142 F.2d 765. Martin contends that the riparian area, thus defined, of her lots became vested in her predecessors, and that its boundaries could not be changed except to meet needs of navigation.

 Though the record shows no express grant of a specific riparian area to Martin's predecessors, the conveyances to them by the land commissioners carried rights to wharf out into the river. United States v. Martin, 85 U.S.App.D.C. 382, 177 F.2d 733, certiorari denied, 339 U.S. 957, 70 S.Ct. 979, 94 L.Ed. 1368. But the commissioners not only did not, but could not, permanently fix the boundaries of these rights: "the only power given to the commissioners was to grant *licenses*, from time to time, and *until* congress should assume and exercise its jurisdiction within the territory * * *. The licenses contemplated therefore were temporary, and liable to be withdrawn by congress on assuming jurisdiction." Morris v. United States, 174 U.S. 196, 282, 19 S.Ct. 649, 683, 43 L.Ed. 946. And the conveyances from the land commissioners were made before 1797, when President Washington approved the Dermott plat. We agree with the District Court that Martin's riparian boundaries did not become fixed in accordance with this plat.

Potomac Steam-Boat Co. v. Upper Potomac Steam-Boat Co., 109 U.S. 672, 3 S.Ct. 445, 27 L.Ed. 1070, and Morris v. United States, 174 U.S. 196, 19 S.Ct. 649, 43 L.Ed. 946, review the early development of Washington. A regulation adopted by commissioners in 1795 permitted owners of river lots to build wharves in the Potomac and the Eastern Branch " 'as they think convenient and proper, not injuring or interrupting navigation, leaving a space, wherever the general plan of the streets in the city requires it, of equal breadth with those streets * * *.' " 109 U.S. at page 675, 3 S.Ct. at page 446, 27 L.Ed. 1070. In 1795 the commissioners submitted this regulation to President Washington with a statement implying that riparian boundaries ran at right angles to the river: " 'no wharves, except by the public, can be erected * * * on the streets at right angles with the water * * *.' " 109 U. S. at pages 676, 688, 3 S.Ct. at page 455. Later official correspondence implies that approval of the Dermott plat in 1797 was not meant to change or fix riparian boundaries. Nicholas King, surveyor of the city, wrote to President Jefferson in 1803: " 'In laying off the city, * * * they stopped * * * on the bank of the river, sold the lots on the high ground with a water privilege, without defining either what the privilege is, or the extent or direction in which the purchasers were to wharf and improve.' " 109 U.S. at 691, 3 S.Ct. at page 457. In 1806 King wrote the President regarding the regulation of 1795 and various plans of the city: " 'The principle adopted in the engraved plan [the Ellicott plan; 174 U.S. at 269, 19 S.Ct. at page 678, 43 L.Ed. 946] if carried into effect and *finally established in the plan now laid out upon the ground,* * * will define the extent and privileges of water lots, and enable the owners to improve without fear of infringing on the rights of others.' " 174 U.S. at 258, 19 S. Ct. at page 674, 43 L.Ed. 946.

II. *"Normal" or right-angle projection: the Hazen plat.* Gulf and the District, impleaded as a third party defendant by Gulf, contend that (1) Congress authorized the Commissioners of the District of Columbia to establish riparian boundaries and (2) the Commissioners did so by adopting the so-called Hazen plat. We agree with the first contention but not the second.

(1) We said in 1944 that the common-law right of riparian owners in the Carrollsburg area is as was "declared in Baltimore & O. R. Co. v. Chase, 43 Md. 23, * * * the right to access to the navigable part of the River, with the right to make a landing, wharf, or pier, subject to such general rules and regulations as the State may think proper * * *." We added that this right is now "subject to change and modification by Act of Congress to the same extent and with the same limitations that change or modification might have been made by Maryland while the land was within its boundaries." United States v. Belt, 79 U.S.App.D.C. 87, 93, 142 F.2d 761, 767.

■ The Baltimore city charter of 1938, and similar language in an earlier charter, empowered Baltimore to establish pier-head and bulkhead lines and "to authorize the erection and maintenance of, and to make such regulations as it may deem proper, respecting wharves, bulkheads, piers and pilings, and the keeping of the same in repair, so as to prevent injury to navigation or health." The Maryland Court of Appeals and the Court of Appeals for the Fourth Circuit have held that this empowered Baltimore to establish riparian boundaries. Classen v. Chesapeake Guano Co., 81 Md. 258, 31 A. 808; Mayor and City Council of Baltimore v. Crown Cork & Seal Co., 4 Cir., 122 F.2d 385, 389. See also Feudale v. Sarles, 190 Md. 244, 58 A.2d 248. We think Congress, by very similar legislation, has granted similar power to the Commissioners of the District of Columbia.[1] An Act of 1899, 30 Stat. 1377, § 1, D.C.Code (1940) § 9–101, gave the District Commissioners power to "make all needful rules and regulations for the government and control of all wharves, piers, bulkheads, and structures thereon, and waters adjacent thereto within the pier lines, and all the basins, slips, and docks, with the land under water, in said District not owned by the United States or the District of Columbia".

■■ As the Maryland court has said, "the fair distribution of space into which riparian owners may be permitted to project wharves, is pre-eminently work for special officials made familiar with the demands of all navigation and all wharfing there, not for the processes of a court of law." Cahill v. Mayor and City Council of Baltimore, 173 Md. 450, 459, 196 A. 305, 309. The problem is to balance the conflicting interests of neighboring riparian owners and of the public, with due regard to existing structures. "While the settlement of the respective riparian rights of adjacent property owners may be easy on a straight shore line, it becomes very difficult on an irregular shore line. * * * It is highly important in the harbor of a great city that the solution of such questions be made with regard not only to the rights of property owners, but also with regard to the safety and welfare of the public." Mayor and City Council of Baltimore v. Crown Cork & Seal Co., supra, 4 Cir., 122 F.2d at 392. An unqualified rule projecting all lot lines straight into the river would unfairly cut off some owners of shore property from access to navigation. Other unqualified rules, including projection at right angles to the bulkhead line, might also work unfairly. "There are indeed no general rules whose application will solve every case." Mayor and City Council of Baltimore v. Crown Cork & Seal Co., supra, 122 F.2d at 392.

We agree with the Court of Appeals

---

1. There is nothing to the contrary in United States v. Martin, 85 U.S.App.D.C. 382, 177 F.2d 733, certiorari denied 339 U.S. 957, 70 S.Ct. 979, 94 L.Ed. 1368, in which we held that Martin had a qualified right to make fills and build wharves, subject to exercise by the United States of its power with regard to navigation. We did not determine the location of Martin's riparian boundaries, or that the United States or the District of Columbia could not fix them.

for the Fourth Circuit that "there is no difference in principle between fixing the distance from the shore beyond which the property owner may not wharf out, and fixing the side lines beyond which he may not intrude upon his neighbors." Mayor and City Council of Baltimore v. Crown Cork & Seal Co., supra, 122 F.2d at 392. Congress expressly empowered the Chief of Engineers, United States Army, and the District Commissioners to establish "harbor lines" subject to approval of the Secretary of War. 30 Stat. 1378, § 3.

(2) We think the Commissioners have not given the Hazen map the status of the "rules and regulations" which Congress authorized the Commissioners to adopt.

In 1933 Hazen, then surveyor of the District, prepared a map showing riparian boundaries running into the river at right angles to the bulkhead line. Brennan, who was Chairman of the District of Columbia Wharf Committee and Chief Clerk of the Engineering Department, endorsed this map on April 3, 1933. On April 26, 1933 he addressed to the Engineer Commissioner of the District a memorandum in 5 paragraphs which discussed various subjects, including Hazen's map. Gulf and the District of Columbia contend that the Board of Commissioners acted on Brennan's memorandum in a way that gave legal force to the map.

The first paragraph of the Brennan memorandum recommended that an "attached letter" regarding a Capitol power plant pumping intake at the foot of First Street, S.E. be sent to the Architect of the Capitol. The second paragraph said the Commissioners had granted authority for an intake at the foot of L Street. The third paragraph said the Architect's office had informed Brennan that the District Engineer Officer had authorized a small wharf at the foot of First Street, S.E. The fourth paragraph, the only one that dealt with the Hazen map or with riparian boundaries, said Brennan had explained to the Harbormaster "the normal extension of property lines and street lines along this section of the Anacostia River, and at that time I gave him a copy of the blueprint prepared by the Surveyor." The last paragraph of the memorandum asked whether the Engineer Commissioner wished Brennan to call the attention of the Director of Highways to an apparent occupation of public space by the Smoot Sand & Gravel Co. The Engineer Commissioner, to whom the memorandum was addressed, noted "Yes" in the margin opposite the last paragraph and noted at the foot of the memorandum: "I move the accompanying letter, or one similar thereto, be sent as addressed"; plainly referring to the "attached letter" mentioned in the first paragraph of the memorandum. This letter had nothing to do with fixing boundary lines between riparian owners. It does not appear that the Engineer Commissioner submitted to the Board anything in Brennan's memorandum except this letter. The Secretary of the Board of Commissioners endorsed on the memorandum, opposite the Engineer Commissioner's recommendation regarding the letter: "Approved by the Commissioners of the District of Columbia Sitting as a Board. Apr. 28 1933." There is nothing to suggest that the Board's approval was broader than the Engineer Commissioner's recommendation.[2]

The Brennan memorandum did not even propose a rule or regulation. No hearings were held. Property owners and the public were given no opportunity to express their opinions of Hazen's idea. Whether or not the Commissioners could have settled the large and complicated question of riparian boundaries in the casual way that Gulf and the District suggest, we think it clear that the Commissioners did not attempt to do so. It is not contended that they did, on any other occasion, officially adopt the Hazen map. In granting permits for wharves since 1933 the District is said to have acted consistently with the Hazen map, but this practice

---

2. Brennan himself testified in the present suit that he knew of no regulation regarding riparian rights and thought the Hazen plan merely a "sort of guiding light as to orderly development."

does not amount to the adoption of a rule or regulation.

■ We conclude that the District Court rightly dismissed Martin's complaint. She cannot prove encroachment on her riparian area until its boundaries have been fixed under rules or regulations adopted by the District Commissioners. We need not now consider the extent to which boundaries so fixed may be subject to judicial review.

The judgment of the District Court dismissing Martin's complaint is affirmed, but we think the court's findings should be modified in conformity with this opinion.

Affirmed.