# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 20, 2010       Decided January 11, 2011

No. 09-5363

UNITED STATES OF AMERICA,
APPELLANT

v.

OLD DOMINION BOAT CLUB,
APPELLEE

Consolidated with 09-5369

Appeals from the United States District Court
for the District of Columbia
(Nos. 1:73-cv-01903 & 1:73-cv-02211)

*Kathryn E. Kovacs*, Attorney, U.S. Department of Justice, argued the cause for appellant. With her on the briefs was *Michael T. Gray*, Attorney. *David C. Shilton*, Attorney, entered an appearance.

*Hugh Nugent* argued the cause for appellee Old Dominion Boat Club. With him on the brief were *Paul J. Kiernan* and *Harry P. Hart*.

Before: TATEL, GARLAND, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Through this action to quiet title to certain "filled," i.e., reclaimed, lands lying on the bed of the Potomac River, the United States seeks to secure public access to the Alexandria, Virginia, waterfront. Defendant, the Old Dominion Boat Club, is an Alexandria private social club the bulk of whose property lies on that filled land. The district court held that despite the United States' ownership of the riverbed, Old Dominion had not trespassed nor was it obligated to provide public access because, as a riparian owner abutting District of Columbia waters, it had the right to lay fill and build wharves. Since binding circuit precedent recognizes just such a right, we affirm.

## I.

In 1632, King Charles I granted a charter for Maryland to Cecilius Calvert, Lord Baltimore. That grant included the bed of the Potomac River, thus establishing the boundary line between Maryland and Virginia at the Virginia shore. *See Morris v. United States*, 174 U.S. 196, 223, 225 (1899). A century and a half later, in 1791, Maryland, having succeeded to title from Lord Baltimore following the Revolutionary War, ceded a portion of its territory, including a piece of the riverbed, to the United States for formation of a seat of government pursuant to Article I, Section 8, Clause 17 of the Constitution. *Id.* at 230. Although Virginia also ceded territory on its side of the river, including Alexandria, the 1791 high-water mark became the District's border and marked the edge of the federally owned riverbed when the United States retroceded Alexandria to Virginia in 1846. Act of July 9, 1846, § 1, 9 Stat. 35, 35–36. In 1945, Congress

moved the boundary to the then-existing high-water mark but clarified that "[n]othing in this Act shall be construed as relinquishing any right, title, or interest of the United States to the lands lying between the mean high-water mark as it existed January 24, 1791, and the boundary line as [now established]." *See* Act of Oct. 31, 1945, Pub. L. No. 79-208, §§ 101, 103, 59 Stat. 552, 552.

Early in the twentieth century, Old Dominion, formed as a private social club in 1880, purchased two adjacent parcels on the Alexandria waterfront. Both parcels occupy reclaimed lands filled after 1791. Old Dominion operates a private clubhouse and marina on one of the parcels and a private parking lot on the other. Both are fenced.

In 1973, the United States commenced this action against thirty-four Alexandria riparian owners pursuant to two statutes that authorize the Attorney General to bring quiet title actions against parcels of dry or submerged land in the District of Columbia. Act of April 27, 1912, Pub. L. No. 62-138 § 1, 37 Stat. 93; Pub. L. No. 79-208 § 103. Claiming ownership of all filled and submerged lands on the District of Columbia side of the 1791 high-water mark, the government argued that those riparian owners, including Old Dominion and its predecessors in interest, had no right to fill the land at issue. Praying for neither trespass damages nor ejection, the government seeks only to establish public access to the Alexandria waterfront, or, at the very least, a public view of the waterfront. *See* Recording of Oral Arg. at 28:35–28:55 (describing that if "you're walking down" toward the water by Old Dominion's parcel "you can't see anything because on one side there's a privacy fence and on the other side there is a parking lot with a chain link fence"). Most of the thirty-four defendants settled, agreeing to some degree of public access.

Old Dominion and three other defendants, owning a total of seven parcels, have continued to defend the lawsuit.

Old Dominion filed a motion for summary judgment, which the district court granted. *United States v. Robertson Terminal Warehouse, Inc.*, 575 F. Supp. 2d 210, 213 (D.D.C. 2008). The district court began its analysis with a threshold question: who owns the riverbed beneath Old Dominion's filled parcels? The court concluded that the United States holds "fee title" to the bed of the Potomac River to the 1791 high-water mark, including Old Dominion's parcels. The United States' "fee title" is "subject to a public trust for navigation and fishery, and the United States cannot use or dispose of the bed of the Potomac River in such a way that would interfere with this trust." *Id.* at 216. The district court also held that Old Dominion had never gained title to the filled riverbed via the doctrine of accretion, which "refers to the increase of riparian land by the gradual deposit, by water, of solid material . . . so as to cause that to become dry land which was before covered by water." *Id.* at 219 (explaining that accretion "does *not* refer to the purposeful addition of land to waterfront property through laying fill and construction of wharves").

The district court next considered whether Old Dominion and its predecessors in interest, as riparian owners, had the right to lay fill and build wharves. Reviewing applicable law, the district court held that Old Dominion had such a right, meaning that its fill and wharves were non-trespassory and that it had exclusive possessory rights to both. *Robertson Terminal Warehouse, Inc.*, 575 F. Supp. 2d at 219–29. According to the district court, this conclusion was driven by three decisions of this court, *United States v. Belt*, 142 F.2d 761 (D.C. Cir. 1944), *United States v. Martin*, 177 F.2d 733

(D.C. Cir. 1949), and *Martin v. Standard Oil Co. of N.J.*, 198 F.2d 523 (D.C. Cir. 1952).

The United States now appeals, arguing, among other things, that *Belt*, *Martin*, and *Standard Oil* are not binding. Our review is *de novo*. *Hendricks v. Geithner*, 568 F.3d 1008, 1011–12 (D.C. Cir. 2009) ("We review a district court's granting of summary judgment *de novo*.").

## II.

Although neither party challenges the district court's choice of law—Maryland law of 1801—we begin by explaining why that choice was correct. This case concerns Old Dominion's riparian rights, and the scope of such rights is determined by the law of the sovereign having authority over the body of navigable water in question. *See Weems Steamboat Co. of Baltimore v. People's Steamboat Co.*, 214 U.S. 345, 355 (1909) ("The rights of a riparian owner upon a navigable stream in this country are governed by the law of the state in which the stream is situated."); *Shively v. Bowlby*, 152 U.S. 1, 26, 36–37 (1894) (same). Here the sovereign is the United States. *See Morris*, 174 U.S. at 230. When Congress accepted the given territories, however, it declared that Maryland law would continue to govern in the territories ceded by Maryland, Act of July 16, 1790, Ch. 28, § 1, 1 Stat. 130, 130, and then later when it created a judicial system for the District of Columbia in 1801, it provided that the laws of Maryland "as they now exist[] shall be and continue in force in that part of the said district, which was ceded by that state to the United States," Act of Feb. 27, 1801, Ch. 15, § 1, 2 Stat. 103, 103–05. Thus, despite the fact that the plaintiff is the United States, the defendant is a private club in Virginia, and the year is 2011, the district court correctly held that "[r]iparian rights within the District of Columbia are governed by Maryland law as it existed in 1801." *Robertson Terminal*

*Warehouse, Inc.*, 575 F. Supp. 2d at 221 (relying on *Morris*, 174 U.S. at 225–30).

As noted above, in concluding that Old Dominion had the right to lay fill and build wharves, the district court relied on *Belt*, *Martin*, and *Standard Oil* (throughout this opinion we shall refer to these cases as the "*Belt* trio"). In each of those cases, we faced actions similar to the one we consider today, and in each we determined that Maryland recognized just such a right. Specifically, in *Belt* we noted in dicta that the rights of riparian owners include the right to "access . . . the navigable part of the [r]iver, with the right to make a landing, wharf, or pier, subject to such general rules and regulations as the State may think proper for the protection of the public." 142 F.2d at 767. In reaching this conclusion, we relied on the Maryland Court of Appeals decision in *Baltimore & Ohio Railroad Co. v. Chase*, in which that court described riparian rights as follows:

> [I]n addition to [the] right by reliction or accretion, the riparian proprietor, whose land is bounded by a navigable river, whether his title extends beyond the dry land or not, has the right of access to the navigable part of the river from the front of his lot, and the right to make a landing, wharf or pier for his own use, or for the use of the public, subject to such general rules and regulations as the Legislature may think proper to prescribe for the protection of the rights of the public, whatever those rights may be.

43 Md. 23, 35 (1875). Citing *Belt*, we expressly held in *Martin* that "[a]n owner of riparian land . . . has a qualified right to make fills and build wharves in the river." 177 F.2d at 734 (internal quotation marks omitted). We reached the

same conclusion in *Standard Oil*, relying on both *Belt* and *Chase*. 198 F.2d at 526.

Because these holdings definitively dictate the scope of Old Dominion's rights, this appeal turns entirely on whether they are in fact binding. Although a panel of this court is generally bound by our earlier decisions, *Davis v. U.S. Dep't of Justice*, 610 F.3d 750, 753 (D.C. Cir. 2010), the government argues that we are not so bound here because the *Belt* trio is inconsistent with (1) subsequent Maryland law and (2) older circuit precedent.

Beginning with the government's first argument, we agree that because the Maryland Court of Appeals serves as the ultimate arbiter of Maryland law, we must depart from our precedent if subsequent decisions of that court make clear that the interpretation of Maryland law set forth in our prior opinions is wrong. *See, e.g.*, *Jaworowski v. Ciasulli*, 490 F.3d 331, 332 n.1 (3d Cir. 2007) ("[W]hen we are applying state law we are, of course, free to reexamine the validity of our state law interpretation based on subsequent decisions of the state supreme court." (internal quotation marks omitted)); *Woodling v. Garrett Corp.*, 813 F.2d 543, 557 (2d Cir. 1987) (same). The government argues that this is just such a case because, according to it, decisions of the Maryland Court of Appeals subsequent to the *Belt* trio make clear that *Chase*, on which all three decisions rest, was wrong when it stated that Marylanders had common law rights to lay fill and build wharves. Instead, the government argues, such rights derive only from statute, and no applicable statute existed in 1801. Although we agree that no applicable statute existed in 1801, we disagree that post-*Belt* Maryland decisions undermine *Chase*. Not only has the Maryland Court of Appeals continued to rely on *Chase* for exactly the principle quoted above, *see White v. Pines Cmty. Improvement Ass'n*, 939 A.2d

165, 166–67 (Md. 2008) (citing *Chase* approvingly, characterizing it as a description of "the common law of riparian rights"), but nothing in the three subsequent Maryland cases on which the government relies definitively establishes that no right to fill and wharf existed at common law as of 1801.

In the first of the cases the government cites, *People's Counsel v. Maryland Marine Manufacturing Co.*, the Maryland Court of Appeals did indeed say that it "ha[d] held that the right to build a wharf or other structure into the water can be derived only from a grant or permission of the State, because virtually all land under water belongs to the State." 560 A.2d 32, 37 (Md. 1989). The other two cases, *Worton Creek Marina* and *Harbor Island Marina*, say essentially the same thing. *See Worton Creek Marina, LLC v. Claggett*, 850 A.2d 1169, 1174 (Md. 2004) ("At common law, 'the fundamental riparian right—on which all others depend[ed] . . . —[was] access to water.' . . . [S]tatutory rights include the right to make improvements into the water in front of riparian property." (quoting *People's Counsel*, 560 A.2d at 37)); *Harbor Island Marina, Inc. v. Bd. of Cnty. Comm'rs*, 407 A.2d 738, 745 (Md. 1979) ("[T]here have sporadically been legislative enactments recognizing, expanding, and redefining the rights and privileges [of] riparian owners . . . . Of particular importance to this case was the inclusion as a riparian right of the privilege to make improvements into the water by the riparian owner from his property."). In our view, however, these cases do not support the government's argument that Maryland riparian owners had no right at common law to lay fill and build wharves. Rather, the cases indicate the possibility that Maryland courts once recognized a right to "wharf out" incident to the paramount riparian right of access to the navigable waters, but that whatever common law rights may have existed were preempted by a series of

Maryland statutes enacted in the eighteenth and nineteenth centuries.

In *People's Counsel*, the Maryland Court of Appeals, far from rejecting *Chase* as aberrant, cast it as a decision that recognized the right to fill and build as a means of access, and the court cited Maryland cases both confirming and contradicting the existence of such a right. *See People's Counsel*, 560 A.2d at 37 n.5. In *Worton Creek*, the Court of Appeals again emphasized the importance of access and then discussed statutory improvement rights solely as they related to the building of waterfowl hunting blinds—a riparian use unrelated to access to navigable waters. *Worton Creek*, 850 A.2d at 1174–75. Although nothing in either decision explicitly makes this distinction between the right to wharf as an independent right—as discussed by the parties in this case—and the narrower right incident to access, the latter concept is well-established. *See* 1 Henry Philip Farnham, *The Law of Waters and Water Rights* 279 (1904) ("[T]he right of access . . . includes the right to erect wharves to reach the navigable portion of the stream."); *see also United States v. River Rouge Improvement Co.*, 269 U.S. 411, 418 (1926) (explaining that, as a matter of general common law, a riparian owner had a right of access and could, where not otherwise forbidden, "construct landings, wharves or piers for this purpose"). This distinction between access and non-access-related improvements may not reconcile the entire body of Maryland case law on this issue, but, at the very least, it calls into question the government's assertion that the *Belt* trio, to the extent it relies on *Chase*, is inconsistent with subsequent Maryland cases.

To support its argument that *Chase* was incorrectly decided, the government also relies on the series of Maryland statutes that gradually extended the right to lay fill and wharf

out to additional riparian lands. According to the government, *Harbor Island, Worton Creek*, and *People's Counsel* confirm that these statutes created rights that had not existed at common law and that Maryland riparian owners have no rights beyond those granted by statute. But we read these cases as demonstrating only that the Maryland legislature has preempted any common law that may have existed and therefore that *today* Maryland riparian owners have no rights beyond those granted them by statute. Critical to the issue before us, these cases say nothing about when that preemption may have occurred. Moreover, by characterizing Maryland statutes as "confer[ring] a right to construct improvements for purposes *beyond mere access* to the navigable portion of the water," *People's Counsel* suggests that the statutory rights represented an expansion—not an initial creation—of improvement rights. 560 A.2d at 38 (emphasis added). Thus, nothing in *Harbor Island*, *Worton Creek*, or *People's Counsel* contradicts the propositions underlying our *Belt* trio holdings—that some right to fill and build existed at common law, that these statutes expanded rather than created the right to fill and build wharves, and that as of 1801 they had yet to preempt the older common law rights.

Having rejected the government's claim that subsequent Maryland case law renders the *Belt* trio non-binding, we turn to the government's alternative claim that the trio conflicts with prior circuit precedent. Again, we agree with the principle underlying the government's argument—when a conflict exists within our own precedent, we are bound by the earlier decision. *See Indep. Cmty. Bankers of Am. v. Bd. of Governors of the Fed. Reserve Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999) ("[W]hen faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom." (internal quotation marks

omitted)). Of course, courts must be careful when invoking this principle, lest they too readily discard a later precedent that distinguished—or is distinguishable from—an earlier decision. In any event, in this case we find no such inconsistency.

The government cites three pre-*Belt* trio cases—two from this court and one from the Supreme Court. In the first, *Marine Railway & Coal Co. v. United States*, 265 F. 437 (D.C. Cir. 1920), the United States sought ejection of a riparian owner in Virginia whose property abutted the federally owned portion of the Potomac and who had taken possession of land reclaimed during a federal dredging project. *Id.* at 438–39. Ruling for the government, we held that the United States retains title to submerged lands covered by artificial fill and that the rights of riparian owners "must yield to commercial necessity." *Id.* at 443. In other words, a riparian owner has no right to procedural due process or just compensation if its riparian rights—whatever those may be— have been cut off by federal efforts to preserve or improve the navigability of a waterway held by the federal government in the public trust. *Id.* Contrary to the government's argument, *Marine Railway*, which says nothing about the scope of riparian rights where the federal government is acting for any purpose aside from promoting the navigability of waterways, is consistent with our later cases. As we explained in *Martin*,

> [a]n owner of riparian land . . . has a qualified right to make fills and build wharves in the river. But exercise of this qualified right does not affect the power of the United States with regard to navigation. 'Structures in the bed of a navigable stream . . . may be injured or destroyed without compensation by a federal improvement of navigable capacity.'

*Martin*, 177 F.2d at 734 (quoting *United States v. Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 312 U.S. 592, 599 (1941)) (internal citation omitted) (ellipses in original). True, *Martin* suggests that a riparian owner can, contrary to *Marine Railway*, obtain title to reclaimed lands, but title is not at issue in this appeal. Accordingly, *Marine Railway*, which addresses the power of the United States to interfere with riparian rights to protect navigation, is consistent with the *Belt* trio, which makes clear that riparian rights are qualified by Congress's "paramount power over the navigable waters of the United States in the regulation of commerce and navigation." *Belt*, 142 F.2d at 767.

We are similarly unpersuaded by the government's discussion of the other two pre-*Belt* trio federal cases: *Shively v. Bowlby*, 152 U.S. 1 (1894), and *United States ex rel. Greathouse v. Hurley*, 60 Wash. L. Rep. 162 (D.C. 1932), *aff'd* 63 F.2d 137 (D.C. Cir.), *aff'd sub nom. United States ex rel. Greathouse v. Dern*, 289 U.S. 352 (1933). Although *Shively* characterizes the right to wharf out and lay fill in Maryland as a statutory rather than a common law right, the case, decided in 1894, merely offers a contemporary assessment of riparian rights and thus says nothing about the state of Maryland law in 1801. *Shively*, 152 U.S. at 23–24. The final decision, *Greathouse*, deals with a riparian owner's request that the court compel the Secretary of War to grant a permit to build where no harbor line had been established. *Greathouse*, 63 F.2d at 138. In the Rivers and Harbors Act of 1899, Congress had authorized the Secretary of War to draw such lines and had prohibited building without a permit either beyond those lines or where no such lines had been drawn. Act of Mar. 3, 1899 ch. 425, §§ 10–11, 30 Stat. 1121, 1151 (codified at 33 U.S.C. §§ 401–404); 33 U.S.C. § 405 (extending coverage of the Act to the Potomac River). *Greathouse* does not support the government's argument. To

begin with, only the Supreme Court of the District of Columbia—a trial level court—actually reached the question of the scope of riparian rights under Maryland law of 1801. Moreover, although that court made some general statements about the nonexistence of common law rights to build, its holding dealt not with whether the riparian owner could build at all—the issue in this case—but with whether the owner had a vested right to build that could not, prior to building, be taken by Congressional action. *Greathouse*, 60 Wash. L. Rep. at 166. As we explained, *supra* at 11–12, the rights in question in this case are qualified—i.e., they are subject to congressional regulation. Indeed, the traditional common law rule was that where such rights existed, they vested only when exercised. *See, e.g.*, *Scranton v. Wheeler*, 179 U.S. 141, 158 (1900) (explaining that the qualified right of access to navigable waters, as manifested in the building of wharves, is a constitutionally protected property right that vests only when those wharves are built). Because Old Dominion has already exercised its rights, the trial court's opinion in *Greathouse* is inapplicable. To be sure, the Supreme Court, considering the case on writ of certiorari, referred to the existence of the common law right in Maryland as "doubtful," but it did so in the course of noting that mandamus is unavailable where the right in question is unclear. *Greathouse*, 289 U.S. at 357–58. The existence of the Maryland common law right was one of a long list of uncertain propositions that would have to have been true to justify mandamus in that case. *Id.*

In conclusion, because the *Belt* trio is consistent with both subsequent Maryland case law and older federal case law, we are bound by its interpretation of Maryland law.

**III.**

Alternatively, the government urges us to certify to the Maryland Court of Appeals the question of what rights Old Dominion has. *See* Md. Code Ann., Cts. & Jud. Proc. § 12-603 (authorizing the Maryland Court of Appeals to accept certified questions from federal courts). "In deciding whether to certify a case we look to whether local law is genuinely uncertain with respect to a dispositive question . . . . If, however, there is a discernible path for the court to follow, then we do not stop short of deciding the question." *Dial A Car, Inc. v. Transp., Inc.*, 132 F.3d 743, 746 (D.C. Cir. 1998) (internal citations and quotation marks omitted); *see also* 17A Charles Alan Wright et al., *Federal Practice and Procedure* § 4248, at 502–07 (3d ed. 2007) (listing considerations relevant to the determination of whether to certify, including the frequency with which the question will come up, the practical limitations of the certification process, and the extent to which considerations of comity are relevant). Certification is thus inappropriate where, as here, we have examined state law and have found a "discernible path" that is consistent with our precedent.

We are unwilling to certify this case for two additional reasons. First, because in the 1800s Maryland adopted a comprehensive statutory framework dealing with the right to wharf out, the state common-law rule at issue here has absolutely no applicability for any riparian land outside of the District of Columbia (and probably not even any applicability beyond the seven parcels at issue in this case, *see* Recording of Oral Arg. at 11:04–11:15, 13:34–14:10, 29:09–30:04). We cannot imagine why the Maryland Court of Appeals would want to spend its limited time on an issue of no consequence to the state of Maryland. Second, this case has been in litigation since 1973, and Maryland law is hardly uncertain enough to justify further delay.

For all these reasons we decline, as counsel for Old Dominion put it at oral argument, to "refer to Maryland courts a question of whether panels of this court in the mid-twentieth century misinterpreted the dictum of a Maryland nineteenth century case applying a mid-eighteenth century Maryland statute that modified sixteenth century common law." Recording of Oral Arg. at 20:41–21:08. We affirm the district court's grant of summary judgment for Old Dominion.

*So ordered.*