# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 27, 2009          Decided June 19, 2009

No. 07-5392

MYRA A. HENDRICKS,
APPELLANT

v.

TIMOTHY GEITHNER, SECRETARY OF THE TREASURY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 03cv02239)

*Molly E. Buie* argued the cause for appellant.  With her on the briefs was *Robert C. Seldon*.

*Alan Burch*, Assistant U.S. Attorney, argued the cause for appellee.  With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.  *Andrea W. McBarnette*, Assistant U.S. Attorney, entered an appearance.

Before: SENTELLE, *Chief Judge*, and GINSBURG and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

Opinion dissenting in part filed by *Circuit Judge* BROWN.

SENTELLE, *Chief Judge*: Appellant Myra Hendricks, a former employee of the Treasury Inspector General for Tax Administration (TIGTA), brought this action alleging sex and race discrimination in her non-selection for two promotions in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e, *et seq.* The district court granted summary judgment in favor of the employer. Hendricks appealed. Finding no error in the district court's conclusions that there was no substantial issue of material fact and defendant was entitled to summary judgment, we affirm.

## I. Background

Appellant's complaint sets forth two claims for relief based on two separate failures to promote: first, to the position of non-supervisory criminal investigator in January 2000; second, to the position of supervisory criminal investigator in the technical and forensic support division in March 2003.

A. *Non-supervisory Criminal Investigator*

In January 2000, appellant was a special investigator for the TIGTA in the Special Inquiries and Intelligence Division (SIID) at the salary level of GS-13. The TIGTA internally advertized an opening for a non-supervisory criminal investigator paid at the GS-14 level. Employees interested in the position sent applications to Patricia DeBonaventura, a human resources specialist. Following the TIGTA's personnel policy, she was responsible for culling from the pool of applicants all those who were "minimally qualified and eligible for the position." DeBonaventura accepted four applications: those of Hendricks (who is black), Robert Johnson (a white man), Jean Keller (a white woman), and Michael Radetic (a white man). Each of the

applicants was a GS-13 special investigator.

DeBonaventura passed those applications on to a "ranking official," Timothy Camus, an assistant special agent in charge at SIID, who graded each candidate in four categories based on the written applications. Grades were out of 10, with 10 superior, 7 satisfactory, and 4 barely acceptable. Hendricks received two 10's and two 7's. The other three candidates each received four 10's. Camus passed these grades, with a recommendation to hire Johnson, to the "selecting official," Brian Dwyer, special agent in charge, who bore the ultimate responsibility for choosing a candidate to fill the position. Dwyer reviewed the applications, read Camus's recommendations, and spoke with Camus, before selecting Johnson.

Hendricks claims that she should have been selected over Johnson because some of his past behavior made him a less desirable candidate to fill the criminal investigator opening. She stresses two incidents from Johnson's past. First, in 1991 (nine years before the selection), Johnson received a letter of reprimand for drinking while carrying his weapon. Second, in 1995 (five years before the selection), Johnson was suspended for 30 days for misusing a government vehicle. According to the subsequent investigation report, he used the car to pick up the manager of a restaurant and another IRS employee and committed additional misconduct that is contained in a sealed file. This was reported by an anonymous source and investigated by the predecessor to SIID in its internal affairs role.

Hendricks also claims that past comments and actions allegedly made and taken by Dwyer cast into doubt the government's claim that Johnson's promotion was based on merit and free from discrimination. Most of the evidence against Dwyer is in the form of proffered testimony concerning

incidents of discriminatory behavior or prejudicial animus directed toward employees other than appellant. The Supreme Court recently discussed this type of evidence in *Sprint/United Management Co. v. Mendelson*, 128 S. Ct. 1140 (2008). That case made clear that in a discrimination case, evidence concerning discriminatory behavior outside the instance in litigation is neither per se relevant under Federal Rule of Evidence Rule 401 nor per se excludable under Rule 403. We assume without deciding that evidence of Dwyer's other behavior would be admissible.

According to testimony of women who worked in SIID, Dwyer made a number of comments disparaging to women and to their role in law enforcement. Some time between May 1998 and April 1999, he said "it was the downfall of Inspection when they hired women." (IRS "Inspection" was the predecessor agency to the TIGTA.) During the same period, he said his office ought to have more men working there. He explained the difficult behavior of a male employee by saying his behavior was "the result of hi[s] being hired in an all male law enforcement work force in the 1970s" and that in that environment his "actions would have been tolerated by other males. It was only when women were hired in law enforcement that men had to change the way they behaved in the workforce."

According to Jean Keller, Dwyer "was very nasty to [her]" when he was an assistant special agent in charge of SIID and Keller was an agent. She also says he assigned her extra administrative duties. Even after Keller was promoted to assistant special agent in charge (ASAC), she says his behavior continued. She complained to his supervisor that he treated her differently than the other ASACs, both of whom were men. A month later she was demoted. Keller says that another employee, Karen Parker, told her that Dwyer read Keller's demotion letter aloud in a departmental meeting. Finally,

Dwyer transferred Keller out of SIID entirely for conduct she alleges was equally egregious to or less egregious than conduct of "other people" who received no discipline.

B. *Supervisory Criminal Investigator in the Technical and Forensic Support Division*

In March 2003, the TIGTA advertized an opening for a supervisory criminal investigator in the technical and forensic support division. This position was at the ASAC level, with a GS-14 pay grade. Of the seven candidates who applied for the position, five were eligible. Of those five, three were considered "non-competitive eligibles"—their current government positions were already paid at the GS-14 level. Two candidates, including Hendricks, were "competitive eligibles" paid at the GS-13 level.

As with the earlier selection, this opening was filled by one official making the selection based upon another official's recommendation. Steven Jones, the assistant inspector general for investigations, made the formal selection after discussing the candidates and receiving a recommendation from Michael Doak, the special agent in charge of the division. Based on "consistent guidance [he had] received from personnelists in filling jobs," Jones considered only the non-competitive applicants. Of those, Jones said that Michael Radetic "was the individual who had the most experience in the various programs managed by this vacancy, in other words, firearm and oversight of firearms programs or federal law enforcement radio or records and then, the tech program or electronics, surveillance equipment."

Whether to consider competitive eligibles was a matter within Jones's discretion. In at least one past hiring, Jones exercised that discretion to consider competitive eligibles when only one non-competitive candidate was available. In that instance, toward the end of 2002 and the beginning of 2003, six

total candidates were interviewed for a GS-14 criminal investigator opening. Ronald McKeever, a white man and one of the competitive eligibles, was eventually hired. The race of the sole non-competitive eligible applicant, John Heckman, does not appear in the record.

## II. Analysis

We review a district court's granting of summary judgment *de novo*. *Hunter-Boykin v. George Washington Univ.*, 132 F.3d 77, 79 (D.C. Cir. 1998). That is, on the record before us, we perform the same analysis as the district court, under which the court is to grant summary judgment if the pleadings, discovery, and disclosure materials of record and any affidavits before the court demonstrate that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see, e.g.*, *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Material facts are those that might affect the outcome of the suit under governing law; genuine issues are those in which the evidence before the court is such that a reasonable trier of fact could find for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-51 (1986). Before the district court, and because our review is *de novo* before this court, the movant has the initial burden of demonstrating the absence of a genuine issue of material fact. Upon such demonstration, the burden shifts to the opposing party to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). In a Title VII case such as this one, where the *prima facie* case as set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), has been taken out of the case by the employer's assertion of a legitimate nondiscriminatory reason for its actions, the question is whether the employer's reason is a pretext for discrimination. *Brady v. Office of the*

*Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Our task, then, is to determine whether there is a genuine issue of material fact with respect to that issue, or if the defendant is entitled to judgment as a matter of law. Upon conducting our *de novo* review, we conclude that there is no such genuine issue and that the district court properly ruled that the employer was entitled to judgment as a matter of law on both claims.

A. *Non-supervisory Criminal Investigator*

The TIGTA argues that Johnson was selected not due to any discriminatory animus toward Hendricks, but because he was the best candidate for the job. A plaintiff can show her employer discriminated by showing that she was "significantly" or "markedly" more qualified for the job than was the candidate who actually received it. *Lathram v. Snow*, 336 F.3d 1085, 1091-92 (D.C. Cir. 2003) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294, 1299 (D.C. Cir. 1998)). If a plaintiff shows this, then "the jury could infer discrimination." *Id.* at 1091 (citing *Aka*, 156 F.3d at 1294)). Without such a decisive showing, we rightfully defer to the business judgment of an employer and have no cause to infer discrimination. But if "a factfinder c[ould] conclude that a reasonable employer would have found the plaintiff to be significantly better qualified," then we question the employer's judgment. *Id.* (quoting *Aka*, 156 F.3d at 1294). "[E]mployers do not usually" "consciously select[] a less-qualified candidate . . . unless some other strong consideration, such as discrimination, enters into the picture." *Id.* at 1092 (quoting *Aka*, 156 F.3d at 1294). While Hendricks identified several instances from Dwyer's past that she says suggest he may be inclined to discriminate against women, she can point to only two discrete instances from Johnson's past to suggest he is less qualified for the job than she is.

Hendricks argues that a reasonable jury could conclude that Dwyer knew or should have known about Johnson's misconduct, and that the details of that misconduct were disqualifying. Some evidence in the record suggests that Johnson had a "cowboy" image and that rumors about him were "widespread" in the agency. Dwyer admits to knowing that Johnson had been investigated for misconduct in the past, but denies knowing the details of the misconduct (saying it "wasn't part of [his] responsibility" to know those details). He did check with his supervisor to see if Johnson's being disciplined would be a barrier to promotion. Dwyer's supervisor, the assistant inspector general for investigations, told him that as long as Johnson "had fulfilled his . . . punishment," it would not be a problem. In any case, Johnson's alleged misconduct all occurred at least five years before the selection, with some of it nine years before the selection.

Hendricks argues that his misconduct strips him of the "integrity" that all parties agree is central to the mission of SIID. But even calling his character into question, Hendricks struggles to assert that Johnson is "significantly" or "markedly" less qualified for the job than she is. Johnson had 14 years of experience compared with Hendricks's 8 years; on the relevant performance appraisal, Johnson received perfect scores in all but one area, whereas Hendricks was downgraded in four areas. She challenges Camus's scoring of her application with two 7's. But even if she clearly established that Camus graded her incorrectly, which she has not, Hendricks failed to produce either direct or circumstantial evidence suggesting his grading was motivated by discrimination. *Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000), cited by Hendricks, is not to the contrary. Although the *Cones* court did transfer evidence of a discriminatory motive from one manager to another, 199 F.3d at 519, it was evaluating a very different case. *Cones* involved ascribing discriminatory intent to the entire process from

someone superficially removed from it. *Id.* Here the alleged discriminatory decision maker, Dwyer, was clearly involved in the process. Camus's contribution, moreover, was unlikely to make a difference. Hendricks's scores were lower than all three other applicants (who had perfect scores). Even if she could prove she deserved perfect scores, this only would have put her on even footing with the other three candidates. To prove her discrimination claim, she would also have to offer evidence supporting an inference that, absent discrimination, she would have been picked for the job.

Hendricks points to evidence of Dwyer's past alleged comments—that there were too many women at SIID, that women were the "downfall" of the agency, and that women are the reason men have to behave in the office. She also points to the evidence concerning Jean Keller, whose alleged mistreatment at the hands of Dwyer is detailed above. But even taking the Keller case at face value, it is ambiguous. While Dwyer was allegedly discriminating against her, Keller was also the only female ASAC in the office. Dwyer might have been mistreating her because she was a woman, or he might have been mistreating her for some other reason. In sum, Hendricks has offered no evidence that the legitimate nondiscriminatory reason offered by the employer was pretextual. We agree with the district court that Hendricks has offered no evidence sufficient for a jury to conclude that Hendricks was not selected on the basis of her sex. (Hendricks supplied no evidence whatsoever alleging discrimination on the basis of her race.)

In *Aka v. Washington Hospital Center*, we opined that a Title VII discrimination plaintiff cannot prevail by presenting evidence that tends to show the employer's proffered reason is pretextual but also "demonstrates that the real explanation for the employer's behavior is not discrimination, but some other motivation." 156 F.3d at 1291. Even viewing Hendricks's

evidence in the most favorable light, her attempted rebuttal of the proffered reason for Johnson's selection at best falls in this category.

Hendricks questions whether Johnson was the most qualified candidate, by offering evidence he lacked the "integrity" necessary for the job. But her evidence supports at most favoritism, not sex discrimination. The evidence of Dwyer's conduct in choosing among the four candidates and selecting the one with the allegedly questionable background did not support an inference that sex drove Dwyer's choice. If he was driven by sex discrimination, Dwyer could have selected Michael Radetic, who was neither female nor had an alleged history of misconduct. Because Dwyer hired Johnson over either Hendricks or Radetic, it suggests at worst that Dwyer acted for idiosyncratic reasons, not discriminatory ones.

Hendricks's case relies almost exclusively on circumstantial evidence that one manager at SIID is difficult and prone to misogynist comments. She also points to years-old conduct to taint Johnson—conduct that Dwyer's supervisor specifically instructed him to disregard. Taken together, this is not sufficient evidence from which a reasonable jury could conclude that TIGTA's asserted reason for selecting Johnson was not the actual reason, much less that Hendricks was not selected because of her sex.

B. *Supervisory Criminal Investigator in the Technical and Forensic Support Division*

Hendricks's claim of discrimination in the later selection is even less substantial. She does not dispute that Steven Jones had discretion whether to consider the group of "competitive eligibles." Instead, she argues that because Jones considered the competitive eligibles in the selection of Ronald McKeever—but

not in the selection of Michael Radetic—this should raise an inference of discrimination. But one instance of using a different procedure is not sufficient to create a pattern and practice from which there was a structural departure that disadvantaged the appellant by reason of her race or sex, and no such inference can be drawn.

In any event, McKeever's case is easily distinguishable. In the McKeever selection, there was only one candidate on the non-competitive eligibles list, and five on the competitive list. Radetic's selection had three candidates on the non-competitive list, and only two on the competitive list. Further, Hendricks has presented no evidence to suggest that Jones's decision had anything to do with race or sex. Even assuming Hendricks had produced some evidence suggesting Jones or Doak (the recommending official) was actually motivated by discriminatory animus, she did not produce evidence sufficient for a jury to conclude that she was not selected because of her sex or race.

### III.  Conclusion

Although Hendricks may have worked in an imperfect office with some flawed characters, without connecting her employer's actions with intent to discriminate against her on the basis of sex or race, she cannot escape summary judgment. We affirm the judgment of the district court.

*So ordered.*

BROWN, *Circuit Judge*, dissenting in part: If a jury were to find Brian Dwyer discriminated against Myra Hendricks, would we reverse because of insufficient evidence? Read in the light most favorable to Hendricks, these are the facts: (1) Hendricks was a talented employee who met or exceeded expectations for all aspects of her job; (2) Robert Johnson, who was promoted instead of Hendricks, had a history of good work interspersed with serious misconduct, including losing his government-issued handgun in a bar fight and not immediately reporting the loss, and being suspended for thirty days for misusing his official vehicle (the full details of his unseemly escapade are under seal); (3) Dwyer said the agency's "downfall" was "hir[ing] women" and his office ought to have more "men," and he justified boorishness because the offending employee "was hired in an all male law enforcement workforce in the 1970s"[1]; and (4) a SIID supervisor, Jacqueline Colonna, declared the office had "girl jobs" and "boy jobs," with women being "tasked with analytical assignments" while men received "high profile matters." Because a jury could find for Hendricks on these facts, I respectfully dissent from my brothers' affirmance *in toto*, though I concur as to the March 2003 nonpromotion.

I do not quarrel with the majority's conclusion that if Johnson's history of misconduct is not considered, then he was at least as qualified as Hendricks, and probably more so. But why would a reasonable juror not consider his history? Common experience tells us that Johnson's personnel file could have been a dealbreaker if someone had *wanted* it to be. After all, in a holistic appraisal of who is better qualified, it is relevant that only one candidate has a checkered past, as a disciplinary record says something about who a person is and what kind of employee he or she will be. Integrity and

---

[1] Indeed, Dwyer suggested "[i]t was only when women were hired in law enforcement that men had to change the way they behaved," and the man's "actions would have been tolerated by other males."

personal probity, moreover, should be especially salient to the promotional prospects of law enforcement officers, for, as a senior TIGTA official put it, "we're in the integrity business." Thus, a reasonable jury could conclude discrimination played a role in Johnson's promotion because he alone had exhibited a marked proclivity for bending the rules, and he was not otherwise substantially better qualified than Hendricks. Think about the issue this way: Imagine Johnson was a woman and Hendricks a man, and Dwyer said Ms. Johnson would not be promoted because of her past misconduct, resulting in Mr. Hendricks being promoted instead. Would Ms. Johnson have a viable Title VII claim? This is a difficult question because notwithstanding her otherwise superior credentials, the presence of serious misconduct, an anti-qualification, adds a different dimension to the comparison. In other words, we would not be surprised if Dwyer were to say: "Sorry Ms. Johnson, but I do not want anyone with your baggage in my department." But here, to Mr. Johnson, Dwyer said nothing of the sort. Why not?

To answer that question, the majority notes Dwyer's supervisor allegedly said that because Johnson fulfilled his punishment, promoting him was not a problem. But even in Dwyer's account of that conversation, his supervisor never said the misdeeds were *irrelevant*, suggesting they only were *not disqualifying*. This distinction is a familiar one, as often even a serious deficiency can be offset by other compelling considerations. Randy Johnson, for instance, has hit a dreary .125 for his career, but his Cy-Young-winning slider covers a multitude of batting-box sins. *See* Randy Johnson, http://www.baseballreference.com/players/j/johnsra05.shtml (last visited June 1, 2009). Robert Johnson is no Randy Johnson. Even if apart from this misconduct he was better qualified than Hendricks, he was not so much better qualified that a court-sitting-as-reasonable jury can conclude

Hendricks' nonselection was free of discriminatory taint. Instead, this is a quintessential question of fact, appropriate *only* for an actual jury to decide. "Although a jury may ultimately choose to believe the [agency]'s explanation of events rather than [the plaintiff's], at this stage we refrain from making credibility determinations, weighing the evidence, or drawing inferences from the evidence—these, after all, are jury functions, not those of a judge ruling on a motion for summary judgment." *Jones v. Bernanke*, 557 F.3d 670, 681 (D.C. Cir. 2009). *See also Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008) ("We must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in his favor, and eschew making credibility determinations or weighing the evidence."); FED. R. CIV. P. 56(c).

The government also argues Dwyer properly ignored Johnson's misdeeds because they did not relate to "integrity." This seems a preternaturally narrow definition of the term, particularly given Johnson's deliberate misuse of the vehicle entrusted to him. Can it really be true that *any* prior act— provided it involves neither illegality nor outright lying—is irrelevant to one's prospects for promotion? What if Johnson were reprimanded for being drunk every afternoon? Or for writing a trashy romance novel at the office? In any event, this "integrity" standard is applied at best intermittently, as Dwyer transferred an employee out of SIID for misconduct unrelated to lawbreaking or lying. Moreover, Dwyer's hostility to women, which our procedural posture requires us to accept as established, further confirms a reasonable jury could find for Hendricks on this record. *See, e.g., Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1295 (D.C. Cir. 1998) (en banc) ("A plaintiff attacking a qualifications-based explanation is of course not limited to comparing his qualifications against those of the successful candidate.");

4

*Czekalski v. Peters*, 475 F.3d 360, 368–69 (D.C. Cir. 2007) (an employer's "disparaging comments" "in conjunction with strong evidence of pretext" creates a jury question).

The majority also faults Hendricks for not presenting evidence that she was better qualified than the other applicants who also were not promoted. No authority is cited for this proposition, for there is none to cite. We do not require a Title VII plaintiff to compare herself to anyone but the person actually selected for the position. *E.g.*, *Aka*, 156 F.3d at 1294 (comparing "plaintiff's qualifications and those of the successful candidate"). Here, I have no idea why Dwyer did not select Michael Radetic, and neither does the majority. *See* Maj. Op. at 10. It could be Dwyer found Radetic annoying, and though Dwyer did not want to hire a woman, he wanted to hire an annoying person even less, so he hired Johnson. Who knows? What the record does show, however, is Dwyer had a problem with women agents and decided to promote a male with a sullied record even though a qualified female with a pristine record was available. We ought to let the jury decide what inference to draw.

If used carefully, our "significantly better qualified" doctrine can accurately reflect the real world. In this case, unfortunately, I fear the majority opinion has myopically applied the doctrine in a way that just doesn't jibe with reality. Because Johnson was better qualified according to the traditional categories, the majority affirms, even though Johnson's bad behavior mingled with Dywer's alleged misogyny makes this an untraditional case. With summary-judgment facts like these, a jury of her peers—not a panel of judges—ought to decide the merits of Hendrick's claim.